E-FILED
Saturday, 21 August, 2021  02:44:57 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| HALEY HEILMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 C 3260 |
| | ) | |
| v. | ) | |
| | ) | |
| MAGGIE BURKE, et al., | ) | Hon. Sue E. Myerscough, Judge |
| | ) | |
| Defendants. | ) | Hon. Tom Schanzle-Haskins, M.J. |

# EXHIBIT 63

Jon Loevy
Sarah Grady
Stephen Weil
Mariah Garcia
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
mariah@loevy.com

# In The Matter Of:

*HEILMAN v.*
*BURKE, et al.*

---

*ANNETTE VEECH*
*August 19, 2019*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 0819VEEA.txt
**Min-U-Script® with Word Index**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                      STATE OF ILLINOIS

 3

 4   HALEY HEILMAN,

 5          Plaintiff,

 6      -vs-                  No. 18-CV-3260

 7   MAGGIE BURKE, et al.,

 8          Defendants.

 9

10

11

12

13            DEPOSITION OF ANNETTE VEECH
                    August 19, 2019
14                    1:00 PM CST
                         CIRA
15                  Bloomington, IL

16

17

18

19               Reported BY:

20        Deann K. Parkinson:  CSR 84-002089

21     Area Wide Reporting & Video Conferencing
                  301 West White
22           Champaign, Illinois  61820
                  (800)747-6789
23

24

25
```

Page 2

```
 1   APPEARANCES:

 2              APPEARING FOR THE DEFENDANTS:

 3         MS. KATHRYN BOYLE
           Office of the Illinois Attorney
 4         General
           500 South Second Street
 5         Springfield, IL  62701
           tdodson@atg.state.il.us
 6

 7              APPEARING FOR THE PLAINTIFF:

 8         MS. SARAH GRADY
           LOEVY & LOEVY
 9         311 N. Aberdeen St. 3rd Floor
           Chicago, IL  60607
10         312-243-5900
           sarah@loevy.com
11

12              *  *  *  *

13

14

15

16

17

18

19

20

21   ALL EXHIBITS TO THE DEPOSITION RETAINED BY MS.
     GRADY.  NONE TENDERED TO THE COURT REPORTER.
22

23

24

25
```

Page 3

```
 1                     INDEX

 2   WITNESS: ANNETTE VEECH

 3   Examination by Ms. Grady........page 5
     Examination by Ms. Boyle.........page
 4   Examination by Ms. Grady.........page

 5

 6

 7                    EXHIBITS

 8   Exhibit No. 11...................page 48
     (training summary document)
 9
     Exhibit No. 12...................page 63
10   (interrogatories)

11   Exhibit No. 13...................page 73
     (adjustment committee report)
12
     Exhibit No. 14...................page 78
13   (time sheet)

14   Exhibit No. 15...................page 80
     (answer to complaint)
15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                     DEPOSITION

 2          The Deposition of ANNETTE VEECH, a

 3   citizen of the State of Illinois, a witness of

 4   lawful age; produced, sworn, and examined upon her

 5   corporeal oath, at CIRA, Bloomington, Illinois, on

 6   August 19, 2019, before Deann K. Parkinson, CSR,

 7   Notary Public in and for the County of Champaign

 8   and State of Illinois, as a witness in a certain

 9   suit and matter now pending and undetermined in

10   the United States District Court for the Central

11   District of Illinois.

12          CSR License No. 84-002089.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1    (The time is 1:32 p.m.)
2         ANNETTE VEECH,
3  the deponent herein, called as a witness, after
4  having been first duly sworn, testified as
5  follows:
6
7         EXAMINATION BY
8    MS. GRADY:
9  Q.   Can you please state your name and spell
10  your name for the record?
11  A.   Annette, A-N-N-E-T-T-E.  Veech,
12  V-E-E-C-H.
13  Q.   Can you tell me, have you ever sat
14  through a deposition before?
15  A.   No.
16  Q.   I'm going to go over some ground rules
17  that will help us move as quickly as possible
18  today.
19         The first is, that if you have any
20  confusion about any of my questions, feel free to
21  let me know.  I'm happy to rephrase so we can
22  understand each other, okay?
23  A.   Okay.
24  Q.   If you don't ask me to rephrase, I'm
25  going to assume that you have understood my

Page 6

1  question and that your answer is in response,
2  okay?
3  A.   Okay.
4  Q.   The second one is make sure you keep
5  your answers verbal and audible.  So make sure to
6  say "yes" or "no" instead of a nod or shake of the
7  head or an uh-huh or uh-uh so we can make sure we
8  get your answer correctly on the record, okay?
9  A.   Okay.
10  Q.   The next is for both of us, please do
11  your best, even if you know what I'm asking, to
12  let me finish my question in its entirety before
13  beginning your answer.  Likewise, I will do by
14  best to let you finish your answer entirely before
15  I start my next question so our record can be
16  clear?
17  A.   Okay.
18  Q.   Lastly, your attorney may be objecting
19  today, but you should go ahead and still answer
20  the questions unless she advises you not to
21  answer, okay?
22  A.   Okay.
23  Q.   Do you have any conditions or take any
24  medication that affect your ability to provide
25  truthful and accurate testimony today?

Page 7

1  A.   No.
2  Q.   Do you suffer from any conditions or
3  take any medications that affect your memory?
4  A.   No.
5  Q.   Any other reasons that might affect your
6  ability to provide accurate testimony or any --
7  A.   No.
8  Q.   Any other issues that might affect your
9  memory?
10  A.   No.
11  Q.   Any other issues that might affect your
12  ability to provide truthful testimony today?
13  A.   No.
14  Q.   Can you tell me where if anywhere you
15  currently work?
16  A.   Logan Correctional Center.
17  Q.   What is your current job title?
18  A.   Beauty shop supervisor.
19  Q.   How long have you been a beauty shop
20  supervisor?
21  A.   Approximately 15 years in that position.
22  Q.   Have you been at Logan that whole time?
23  A.   No.
24  Q.   Have you been working for the IDOC that
25  whole time?

Page 8

1  A.   Yes.
2  Q.   When did you first begin working for
3  IDOC?
4  A.   1995.
5  Q.   Was your job title beauty shop
6  supervisor when you first began?
7  A.   No.  I was a library technical
8  assistant.
9  Q.   Where were you a library technical
10  assistant?
11  A.   At Logan.
12  Q.   And at that time it was a male facility,
13  correct?
14  A.   Co-ed.
15  Q.   Oh, wow.
16  A.   Yes.
17  Q.   Did you work with one or the other or
18  did you work with both?
19  A.   Both genders.
20  Q.   How long did you work as a library tech
21  assistant?
22  A.   I want to say until approximately '99.
23  Then I transferred to Lincoln Correctional Center
24  as the beauty shop supervisor with the females.
25  Q.   Can you give me an overview just in

Page 9

1  general of what your job was as a library tech
2  assistant?
3     A.  I notarized documents for the offenders
4  that were filing for any type of divorce or child
5  custody.  Made copies.  Just general library tasks
6  I was a licensed cosmetologist at the time, they
7  just didn't have a position available so I did
8  that until there was a position available.  Then I
9  took the job as a beauty shop supervisor when
10  there was an opening.
11     Q.  Can you tell me what post high school
12  education, if any, you have received?
13     A.  Other than my license for cosmetology,
14  nothing.
15     Q.  Did you have to study or complete some
16  formal education in order to obtain your
17  cosmetology license?
18     A.  Yeah, I went to cosmetology program,
19  school.
20     Q.  Where did you do that?
21     A.  In Lincoln.
22     Q.  And when did you complete that program?
23     A.  I don't recall the exact date, but I did
24  get my license in '94.  I don't remember the exact
25  date of my completion.

Page 10

1     Q.  Did you work anywhere between obtaining
2  your license in '94 and beginning work for the
3  IDOC in '95?
4     A.  Are you asking me, did I work anywhere
5  in a hair salon?
6     Q.  Anywhere at all?
7     A.  I have worked for yes, from the time I
8  was 16 until then or just --
9     Q.  Since you obtained your license in '94,
10  but before starting at IDOC in 1995, did you have
11  any employment?
12     A.  I worked for a car dealership.  Other
13  than that, I don't recall.
14     Q.  So you worked, but not in the field of
15  cosmetology at that point, correct?
16     A.  At that point, then I also worked at
17  BJs Grand Salon in Springfield, but I don't
18  remember the dates.
19     Q.  Is that while you were employed for IDOC
20  or a different time?
21     A.  No.  Since I've been employed for IDOC
22  I've never worked anywhere else.
23     Q.  Is BJs Grand Salon in Springfield the
24  only non-IDOC place you have worked as a licensed
25  cosmetologist?

Page 11

1     A.  No, I worked for a salon called
2  Hairtastics in Lincoln.
3     Q.  When did you do that?
4     A.  That was prior to corrections.
5  Approximately 91-92 maybe.  Somewhere around
6  there.
7     Q.  So that was before you were licensed?
8     A.  No, I was licensed -- or I'm getting
9  confused with my dates.  I had no idea I needed
10  all these dates.  I don't recall those dates.  I
11  don't recall those dates.
12     Q.  Okay.  So let me do it this way.  Can
13  you tell me all the other places other than IDOC
14  that you've worked as a cosmetologist?
15     A.  It was called BJs Snips and Snaps,
16  Springfield.  And then I worked for Hairtastics in
17  Lincoln.  The only two hair salons I've worked in.
18     Q.  And you worked at Logan as a library
19  tech assistant beginning in 1995, correct?
20     A.  Yep.
21     Q.  Did you apply for that position or did
22  you apply for a different position?
23     A.  I applied for that position.
24     Q.  And did you apply to work for the IDOC
25  once or more than once?

Page 12

1     A.  Just once that I recall.
2     Q.  Have you worked continuously since 1995
3  for the Illinois Department of Corrections?
4     A.  Yes.
5     Q.  Once you transferred to Lincoln as the
6  beauty shop supervisor, tell me the next time your
7  job changed in any way?
8     A.  The job didn't change.  Just location
9  'cuz we had a transition back to Logan.  Had to do
10  with the logistics, the move.  So I was sent back
11  to Logan, but same position.
12     Q.  Okay.
13     A.  Location just changed.
14     Q.  And when was that, if you recall?
15     A.  I think it was 2013.
16     Q.  Has your job changed in any way since
17  you moved to Logan as beauty shop supervisor?
18     A.  No.
19     Q.  Can you tell me what the duties and
20  responsibilities of a beauty shop supervisor are?
21     A.  I supervise an inmate beauty shop, and
22  we perform hair care for the offenders.  Everyone
23  that works for me is an offender.  They work under
24  my license.  I on the average have eight to 12
25  workers.  We do basic hair care.  Hair cutting.

Page 13

1  Chemical relaxers.  Curly perms.  On occasion we
2  have done facial waxing.  I interview and hire
3  offenders.  I sign offenders in and out.  And I
4  supervise and do a log book of tools that are
5  being used by the offenders.  I do all the
6  scheduling.  I sign their payroll.  Pretty much
7  just oversee the whole production and the daily
8  operation of the prison beauty shop.
9      Q.    And the clientele is only prisoners, is
10  that correct?
11     A.    At this time it is.  Yes.
12     Q.    Was that different at some prior point?
13     A.    Yes.  There was a time when we used to
14  provide services for staff, and they no longer do
15  that.
16     Q.    When was that?
17     A.    I don't know the date.
18     Q.    And in the fall of 2016 and the early
19  January February of 2017 were staff still able to
20  obtain services from your salon?
21     A.    There was a time when offenders were
22  doing hair and I was doing hair.  Then offenders
23  stopped cutting staff's hair.  Then there's
24  occasionally I have cut staff's hair here and
25  there.  But we don't provide a service from the

Page 14

1  inmates that cut staff's hair.  Inmates only cut
2  inmates' hair.
3      Q.    But my question is, were prisoners
4  cutting staff's hair in the fall of 2016 or had
5  that policy already changed?
6      A.    No.  We did not.  I just don't recall
7  when the legal, we were told no more.  I just made
8  the judgment call because of the amount of time I
9  had to provide service for the inmates, that I no
10  longer had time to provide a service for staff.
11  So I did it.  Then a legal came out and said we
12  don't provide any services for any staff.  That
13  offenders do.  And legal may be the wrong word, I
14  was just verbally told we don't do that any more,
15  so we don't do that.
16     Q.    I understand.  But in 2016, in fact, at
17  Logan Correctional Center, prisoners were already
18  not cutting staff's hair?
19     A.    No.
20     Q.    You said that you interview and you hire
21  prisoners to work.  Can you tell me, do you have
22  discretion about who you hire?
23     A.    I do have discretion.  I do not have the
24  final call.
25     Q.    Who has the final call?

Page 15

1      A.    Usually the adjustment committee and the
2  placement officer.
3      Q.    Is that like, do you have veto power?
4      A.    The offenders will interview, and they
5  work under my license.  If I feel that they are
6  skilled enough to work in the job, I will submit
7  their name and number to placement, placement then
8  checks their disciplinary record and I guess their
9  assignment history.  And if they qualify for
10  whatever they need to work in my shop, then they
11  approve them or disapprove them to work in my
12  shop.
13     Q.    And so they wouldn't be working in your
14  shop if you said that you didn't think they were a
15  good fit, right?
16     A.    No.
17     Q.    But even if you think they're a good
18  fit, they have to get checked out through the
19  adjustment committee and the placement officer?
20     A.    Yes, there's criteria that has to be met
21  for them to work in my shop.
22     Q.    And what is your understanding of that
23  criteria?
24     A.    Usually they have to be an A grade
25  status.  And just the ticket, their ticket

Page 16

1  history.  They can't be getting in trouble a lot.
2  And obviously they have to be skilled somewhat to
3  work in the shop.
4      Q.    Tell me about that?
5      A.    Cutting hair.  Applying relaxers.  Doing
6  curly perms.
7      Q.    So they have to have some experience in
8  the field of cosmetology?
9      A.    Yeah, but they do not have to be
10  licensed because there's no way I could get hired
11  licensed people incarcerated to work for me.  So I
12  interview them; if they have a skill, then I hire
13  them.
14     Q.    Okay.  What's your understanding of the
15  disciplinary history requirements for prisoners to
16  be authorized to work in the beauty shop?
17     A.    As far as I know it's just as long as
18  they haven't had an extensive disciplinary record.
19  As far as exactly what they look for, I'm not
20  sure.
21     Q.    Okay.  And do you have any understanding
22  about whether prisoners have to be at a certain
23  grade or a certain security classification in
24  order to work for you?
25     A.    I'm unaware of the security

Page 17

1  classification.  I just recall them having to be A
2  grade to work in my shop.
3      Q.   When you interview prisoners, other than
4  experience in cosmetology, what are you looking
5  for?
6      A.   Just skill.  I don't look to see what
7  they're incarcerated for or anything.  I just want
8  to make sure they know how to do hair.  That's all
9  I look for.
10     Q.   Do you look for like personality fit?
11     A.   Well, obviously I'm not going to hire
12  anyone who I might feel that the other offenders
13  might be threatened by or uncomfortable with.
14     Q.   Is your position a popular one?  Do a
15  lot of people try to apply for it?
16     A.   Yes and no.  I mean, a lot of people
17  want to apply but I have to weed them out because
18  obviously not everyone is skilled for the job.
19     Q.   So if I'm at Logan and I want to work in
20  your shop, tell me the process from the beginning
21  to the end?
22     A.   They would either write me a request
23  slip and just tell me that they're interested in
24  applying for a position.  Then I will send them a
25  call pass.  And usually two or three days in a row

Page 18

1  consecutively I will interview them.  I will talk
2  to them briefly.  Then I will usually have them do
3  a simple bang trim or just a trim, something
4  simple to see if they know how to hold their
5  shears properly.
6          And then I slowly gradually move up to
7  something a little harder and a little harder, and
8  then once I made my decision I submit their name
9  to the placement officer.  Then they usually tell
10  me "yes" or "no".
11     Q.   And you said that you typically have 8
12  to 12 people working for you at a time?
13     A.   Uh-huh.
14     Q.   How long are they able to work in that
15  position?
16     A.   Until recently, I have had no issues
17  with skilled workers staying with me unless they
18  get a ticket or get in trouble or discipline or
19  move to another assignment.  But here recently
20  they have started pulling offenders off of their
21  assignments that's been there for a lengthy amount
22  of time even if they haven't gotten in trouble so
23  --
24     Q.   And what's the time frame?  Like six
25  months?

Page 19

1      A.   Six months; six months to a year.
2      Q.   When did that switch happen?  Was that
3  like within the past year?
4      A.   Uh-huh.
5      Q.   Is that a yes?
6      A.   Yes.
7      Q.   You also talked about scheduling.  And
8  you talked about signing payroll.  Are all the
9  prisoners paid the same or do some make more than
10  others?
11     A.   All the offenders work for me that make
12  the same amount, but other assignments make
13  different amounts.  Yes, they all make the same
14  pay.
15     Q.   What is that?
16     A.   I think it's $1.43 a day.
17     Q.   And how many days a week is the beauty
18  shop open?
19     A.   Five days.
20     Q.   What are the hours?
21     A.   Soon as count clears until approximately
22  2:30.
23     Q.   So that's approximately?
24     A.   Approximately 8:00, 8:30, as soon as
25  count clears they come to their assignment and we

Page 20

1  have to finish by 2:30 so they are back by there 3
2  o'clock count.
3      Q.   And is it Monday through Friday, the
4  five days?
5      A.   Yes.
6      Q.   How does the scheduling work?
7      A.   If an offender wants a haircut they just
8  send me a request slip, basically stating they
9  want a haircut or relaxer or what they want done,
10  then I schedule them and send them a call pass.
11     Q.   My question was actually more towards
12  the workers.  How many workers do you typically
13  have on working on any given day?
14     A.   I have six stations.  So the average is
15  eight.  I try to have more, but right now I don't
16  have as many workers as I'd like to have.
17     Q.   And so do you just do -- how many -- of
18  prisoners working in your beauty shop,
19  approximately how many days per week does that
20  person work on a typical weekday per week?
21     A.   How many days a month or how many days a
22  week?
23     Q.   How many days a week?
24     A.   Five.
25     Q.   Okay.  And then do they switch off for

Page 21

1  weeks?
2  A. No, they just -- if I hire them they
3  will get a starting date. They will work until
4  their six-month assignment. And then I guess
5  they're rotated out to another position. Or a
6  year, if they get a year assignment then they are
7  rotated out to another assignment. Is that the
8  question?
9  Q. I think I just was misunderstanding.
10 When you say you do the scheduling for the beauty
11 salon, you're actually talking about scheduling
12 customers, not workers?
13 A. Right. Yes.
14 Q. Because all of your workers work every
15 day in the shop?
16 A. They get an assignment activity sheet.
17 So they come on -- every day they know they're
18 supposed to come to work at a certain time every
19 day five days a week. The scheduling is the
20 customers, the other offenders that are coming in
21 to get their hair cut.
22 Q. I see. And do your hours differ from
23 that eight to three time period?
24 A. Yes.
25 Q. Tell me what are your typical hours?

Page 22

1  A. I arrive at 7:30 and leave at 4:00.
2  Q. And what do you do during those other
3  times?
4  A. While I'm at the prison working?
5  Q. Correct.
6  A. If I'm not actually supervising the
7  offenders I am sorting request slips, filling out
8  the movement sheet. Tool logs. Inventory.
9  Q. Doing all those other things that are
10 not direct supervision?
11 A. Uh-huh.
12 Q. Is that a yes?
13 A. Yes.
14 Q. Where is the beauty shop located?
15 A. In the building called the security
16 center.
17 Q. Is that the main building when you get
18 on grounds?
19 A. No. We are further, further back by the
20 chow hall.
21 Q. What's the nearest housing unit?
22 A. Right across from us is Housing Unit 4
23 and 5.
24 Q. And what else is in that building?
25 A. It's a long narrow building. So we have

Page 23

1  numerous doors. But, in our door when you come
2  in, there is placement and assignment. My shop.
3  Clothing room. And the adjustment committee.
4  Q. Okay. Do you have an office that is
5  somewhere other than the beauty shop?
6  A. No.
7  Q. Do you have an office in the beauty
8  shop?
9  A. It's not an office. It's an open room
10 like this and my desk sits here and the offenders
11 sit all around me. Completely open.
12 Q. I see. I don't think I ever introduced
13 myself, I'm sorry about that. My name is Sarah
14 Grady, I am an attorney for the Plaintiff, Haley
15 Heilman in this case.
16 A. Okay.
17 Q. I want to talk to you about your
18 independent recollection of Haley Heilman. So to
19 help us make sure that we understand one another,
20 I just want to tell you what I mean by independent
21 recollection. When I use that phrase, I mean a
22 memory that you have in your mind without relying
23 on reading a document about who she is, or hearing
24 from someone else who she is. So I'm going to ask
25 you a number of questions about your independent

Page 24

1  recollection.
2  A. Okay.
3  Q. But first, do you have an independent
4  recollection of Haley Heilman?
5  A. Not really.
6  Q. Do you have any independent recollection
7  of the beauty shop staff or operations in January
8  and February of 2017?
9  A. I vaguely recall a few. Are you asking
10 me which offenders were working for me, is that
11 what you're asking?
12 Q. I'm just asking whether you remember
13 that time frame and being at the beauty shop
14 during that time?
15 A. Vaguely.
16 Q. Okay. Tell me what you remember.
17 A. It's every day all day long. New faces.
18 All signing inmates in and out. All day long.
19 I'm supervising eight to ten offenders that have
20 shears and clippers and liners. It's very, very,
21 very busy. I'm signing people in, signing people
22 out, answering the phone. Checking appointments.
23 Pretty much doing everything. There's no security
24 officer in there. So I'm my own security. It's
25 very, very busy.

Page 25

1  Q.  Do you recall any of the people that you
2  interact with at the beauty shop during that time
3  frame, does anything stand out to you about
4  January and February of 2017 in any way?
5  A.  No, not really.  Everything was just the
6  normal.  Every day inmates coming in, every day
7  someone is unhappy about something, and then I
8  sign them in, they get their hair done and they
9  leave.  Whether it's my workers signing them in
10  and out or other inmates in and out.  I mean, it's
11  just every day.  That's what I do.
12  Q.  Okay.  Do you have any independent
13  recollection of Jennifer Fleming?
14  A.  Yes.
15  Q.  Tell me what your recollection of her
16  is.
17  A.  On that particular time or just in
18  general?
19  Q.  Right now I'm asking just in general.
20  A.  I see her approximately every six weeks
21  for her maintenance haircut.  She comes in.  She
22  gets her hair cut.  We don't speak.  I take her
23  call pass, check her ID, sign her in, sign her
24  out.  She goes and sits in a chair and gets a hair
25  cut and leaves after I've signed her out.

Page 26

1  Q.  Have you ever spoken with Ms. Fleming
2  about her sexual assault of Haley Heilman?
3  A.  Never, no.
4  Q.  Have you ever spoken with Ms. Fleming
5  about Haley Heilman at all?
6  A.  No.
7  Q.  Have you ever spoken with Ms. Fleming
8  about this lawsuit?
9  A.  No.
10  Q.  Do you have an independent recollection
11  of having any discussion with any member of the
12  IDOC staff or other prisoners about Haley Heilman?
13  A.  No.
14  Q.  Tell me about when you first heard of
15  the sexual assault on Haley Heilman?
16  A.  I believe it was a Monday.  Monday, I
17  came back to work, and I went into the building,
18  and I don't recall the person.  But there was a
19  staff telling me that one of my workers were no
20  longer working because she had an incident that
21  past weekend.  That's the first time I heard of
22  the incident.
23  Q.  And did you hear that it was Haley
24  Heilman?
25  A.  Yes.  They have to tell me because I

Page 27

1  have her scheduled to work.  And then I have
2  appointments scheduled for her to do.
3  Q.  Did they tell you the reason she wasn't
4  coming in to work was because of the sexual
5  assault?
6  A.  The reason was never discussed.  I was
7  just told she was not coming to work.
8  Q.  Okay.  So when was the first time that
9  you learned about Haley Heilman being sexually
10  assaulted?
11  A.  Obviously within a day or two of it
12  happening you overhear things.  But I never had
13  direct conversation.  The most I knew is when I
14  was served the lawsuit.
15  Q.  Are you related to Nicole Veech?
16  A.  Yes.
17  Q.  How are you related to her?
18  A.  She was married to my son.  They are now
19  divorced.  So my ex daughter-in-law.
20  Q.  When did they divorce?
21  A.  Approximately two years ago.
22  Q.  Can you tell me whether it was before or
23  after February of 2017?
24  A.  Oh, my.  May have been right close to
25  that time.

Page 28

1  Q.  Before their divorce did you have a
2  close relationship with her?
3  A.  Yes.
4  Q.  Do you still have a close relationship
5  with her?
6  A.  Yes.  Everything is fine.
7  Q.  Sorry?
8  A.  Yes, everything is fine.
9  Q.  Does she and your son have children?
10  A.  No.
11  Q.  Do you, during the divorce, did you see
12  her socially?
13  A.  Occasionally.
14  Q.  Do you still see her socially?
15  A.  Not socially.  No.
16  Q.  Do you see her at work?
17  A.  Occasionally if she's on grounds.
18  Q.  Does your son also work for the IDOC?
19  A.  No.
20  Q.  Do you interact with her at work in any
21  capacity on a regular basis?
22  A.  I speak if I see her.  But I don't --
23  Q.  Do you ever work together?
24  A.  No.
25  Q.  She to my understanding at least in 2017

Page 29

1  was working in the IA office?
2  **A.  Yes, on grounds.  Yes.**
3  Q.  And you don't have any interaction with
4  that office as part of your job duties, correct?
5  **A.  Not unless there's something I need to**
6  **report in writing.  But, there's a process to get**
7  **information to the internal affairs office,**
8  **documentation.**
9  Q.  Did you ever discuss Haley Heilman with
10  Nicole Veech?
11  **A.  No.**
12  Q.  Did you ever discuss this lawsuit with
13  her?
14  **A.  No.**
15  Q.  You know that she is also named in this
16  lawsuit?
17  **A.  Yes.**
18  Q.  Do you recall having a conversation with
19  Justin Gannon about Haley Heilman?
20  **A.  I do not recall that conversation.  I**
21  **just don't recall it.  If I had it, I don't recall**
22  **it.**
23  Q.  When you say that conversation, is this
24  a conversation that you've since been made aware
25  of?

Page 30

1  **A.  I speak -- no.  I speak to Gannon.  I**
2  **speak to all the sergeants, all the lieutenants,**
3  **on a daily basis about all kinds of things.  So, I**
4  **thought just you were referring to this; so I just**
5  **assumed that.**
6  Q.  Okay.  Do you recall having any
7  conversation with Gannon about Haley Heilman or
8  Jennifer Fleming?
9  **A.  Never Jennifer Fleming; never Jennifer**
10  **Fleming.  If, like I said, if I did with Haley, I**
11  **don't recall the conversation.  I don't.**
12  Q.  But fair to say, you don't recall one
13  way or the other?
14  **A.  Yes.**
15  Q.  You're not disputing Sergeant Gannon's
16  testimony that that conversation occurred?
17  **A.  No, because like I've said, I can not --**
18  **I just don't recall it if I did.  I'm not saying I**
19  **didn't.  I'm just saying, I don't recall it.**
20  Q.  I'm going to read you a list of names,
21  and I'm going to ask whether you discussed Haley
22  Heilman with any of these other individuals.
23  **A.  Okay.**
24  Q.  These are all defendants in this
25  lawsuit.

Page 31

1  **A.  Do you want me to say yes or no on each**
2  **person that you ask?**
3  Q.  If you can keep these names in your
4  mind, then I will read them all and then ask you.
5  But if you think it will be too difficult, I can
6  ask you one by one?
7  **A.  It's fine.  I'll try to remember.**
8  Q.  Maggie Burke, Beatrice Calhoun, Angel
9  Wilson, Rachel Aiken or Boose, Josh Edwards, Jacob
10  Garringer, Justin Gannon, Chase Goleash, Kelby
11  Jasmon, Christopher Lynch, Legna Velazquez, Todd
12  Sexton, Nicole Veech, Brandon Lounsberry, Adam
13  Cox, Guy Carter, Troy Singleton, Greg Dejarnette.
14  **A.  Josh Edwards is the only one, and we had**
15  **a brief discussion when we were served the paper.**
16  **I just made a comment, did you get involved, how**
17  **did we get involved in this lawsuit or whatever.**
18  **That was it.  He was the only one.  But details,**
19  **no.**
20  Q.  Is Josh Edwards someone you know?
21  **A.  He's a correctional officer that over**
22  **the years we've worked together in the same**
23  **building.**
24  Q.  Was anyone else a part of this
25  conversation?

Page 32

1  **A.  No.**
2  Q.  Where did this conversation occur?
3  **A.  The security center.**
4  Q.  And this was when you were getting
5  served?
6  **A.  The day of or the day after we were**
7  **served.**
8  Q.  And how did you know that he was also
9  involved in the lawsuit?
10  **A.  There was something, I saw his name on**
11  **that I knew he was involved.  I don't remember**
12  **what it was.**
13  Q.  Did you initiate the conversation or did
14  he initiate the conversation?
15  **A.  I think I did.**
16  Q.  And what was his response when you asked
17  him how you got involved?
18  **A.  We both just looked at each other like,**
19  **we are involved.  Like, I don't understand.  It**
20  **was just that.  It really wasn't a conversation.**
21  **An acknowledgement.**
22  Q.  Did you have any further discussion with
23  him about this lawsuit?
24  **A.  No.**
25  Q.  Did you have any other conversations

Page 33

1  with any of the other individuals that I read out
2  loud about the lawsuit?
3    A.   No.
4    Q.   Did you have any other conversations
5  with any of the other defendants to your
6  recollection about Haley Heilman at any point?
7    A.   No.
8    Q.   Did you have any discussions with
9  anybody about, of those names I read out loud,
10  about Jennifer Fleming at any point?
11    A.   No.
12    Q.   Have you ever raised any concerns at any
13  point in time about Jennifer Fleming's conduct to
14  anybody?
15    A.   Her conduct as far as being an offender?
16  Her behavior?
17    Q.   Have you ever voiced or raised any
18  concerns about Jennifer Fleming at all?
19    A.   Just, can I move forward to just the day
20  that when one of those days when Haley came into
21  the shop and was discussing with the other
22  offenders who her new roommate was going to be,
23  and they all were talking, talking, talking, and I
24  just made the comment that, I'm sorry that you
25  have to be housed with someone who's loud and

Page 34

1  obnoxious. So I guess with the other offenders,
2  but not other staff.
3    Q.   Is there anyone else that you've ever
4  discussed Jennifer Fleming with?
5    A.   No. Not her behavior. 'Cuz I have to
6  discuss inmates getting in, like if I've had to
7  call a unit and ask, is Fleming on the unit?. She
8  has a call pass, that type of thing. So I have to
9  discuss inmates with other staff.
10    Q.   So leaving that to the side, the
11  discussions you have to have in order to get
12  people to and from your beauty shop?
13    A.   Yes.
14    Q.   Have you ever discussed Jennifer Fleming
15  with anyone other than your attorneys?
16    A.   No.
17    Q.   Can you tell me what your opinion of
18  Jennifer Fleming is?
19    A.   She seems troubled. I honestly never
20  thought that she was capable of what she was
21  accused of doing. I'm only around these offenders
22  approximately a half hour to 45 minutes in an
23  environment that they're receiving something they
24  want. So I don't always see all the negative
25  behavior. I only see a little bit of the

Page 35

1  behavior. Because they obviously want what I have
2  to offer, so they're not going to act in a manner
3  that would not allow them to receive a haircut.
4  Do you understand? So I don't see their behavior
5  the same as when they're on a housing unit. I
6  don't see their interaction with other inmates and
7  correctional officers.
8    Q.   Did you discuss the sexual assault after
9  overhearing about it with anyone?
10    A.   No.
11    Q.   Can you tell me as you sit here today
12  what is your understanding of what this lawsuit is
13  about?
14    A.   Obviously just what I read in it, that
15  on my part or the whole thing?
16    Q.   Both.
17    A.   That she is claiming that she told me
18  that she was being, I guess assaulted, which never
19  occurred. I mean, she never told me that. And I
20  guess we failed to protect her, I guess is my
21  understanding.
22    Q.   Can you tell me what you did to prepare
23  for today's deposition?
24    A.   I just read over the two documents that
25  I had. And speaking with our counsel a little

Page 36

1  bit. That's it.
2    Q.   How many times did you talk to the
3  attorneys? I don't want to know the contents of
4  any conversations, but how many times did you talk
5  to your attorney?
6    A.   The one I spoke to Friday, him; and then
7  the first prior to the first deposition that was
8  canceled. I spoke with Jeff briefly.
9    Q.   And what were the -- did you have any
10  conversations with any other individuals about
11  your deposition today?
12    A.   No.
13    Q.   Did you tell your daughter or ex
14  daughter-in-law that you were planning to come to
15  testify in this case today?
16    A.   No.
17    Q.   What were the two documents you
18  reviewed?
19    A.   The actual documentation that I was
20  served.
21    Q.   The complaint?
22    A.   Yeah.
23    Q.   The one that contained allegations?
24    A.   Yes.
25    Q.   That the Plaintiff was making?

Page 37

1    A.   Yes.  That had all the details of what
2  happened the day of the incident.  That.  And then
3  just some questions that, I don't know what it's
4  called; the derogatory thing.
5    Q.   The interrogatories?
6    A.   Yeah, that.
7    Q.   Any other documents you reviewed to
8  prepare for today's deposition?
9    A.   No.
10   Q.   I can read you these list of names
11  again, sorry, forgot to ask you.  Are there any,
12  other than Nicole Veech that we talked about, that
13  you socialize with outside of work?  Should I read
14  them again?
15   A.   Maybe once or twice, Josh Edwards at a
16  retirement party, but other than that, no one.
17  But you could read the names again for me.  A
18  majority of those people I don't even know them, I
19  know their names but not in person.
20   Q.   I will do that just so you can make
21  sure.  We can make sure you're giving accurate
22  testimony?
23   A.   When I say I socialized, it's just with
24  Edwards I was at a retirement party one time, same
25  staff.  But other than that, not on like a hanging

Page 38

1  out, no.
2    Q.   I'm going to read the list again.
3  Maggie Burke.  Beatrice Calhoun.  Angel Wilson.
4  Rachel Aiken or Boose.  Josh Edwards.  Jacob
5  Garringer.  Justin Gannon.  Chase Goleash.  Kelby
6  Jasmon.  Christopher Lynch.  Legna Velazquez.
7  Todd Sexton.  Nicole Veech.  Brandon Lounsberry.
8  Adam Cox, Guy Carter, Troy Singleton and Greg
9  Dejarnette.
10   A.   Once I was at a Christmas party that
11  Gannon was at, a staff-related Christmas party.
12  Don't remember what year.  And one other time I
13  went to Troy Singleton's retirement party.  But
14  nothing was ever -- that was it.
15   Q.   Do you have a Facebook account?
16   A.   Yes.
17   Q.   Do you belong to the Facebook group,
18  "Behind the Walls"?
19   A.   Yes.
20   Q.   Have you ever posted on that group about
21  any topic?
22   A.   Never.
23   Q.   Have you ever commented on a post for
24  any reason?
25   A.   No.

Page 39

1    Q.   Have you ever at any point seen any post
2  on that Facebook group regarding Haley Heilman?
3    A.   No.
4    Q.   Have you ever seen any posts on that
5  Facebook group regarding sexual assault or
6  misconduct at Logan?
7    A.   No.
8    Q.   It sounds like there was a pause.  Are
9  you confident that you have never seen any such
10  post?
11   A.   At Logan?  I don't recall.
12   Q.   Do you recall seeing a post about sexual
13  assault or misconduct generally?
14   A.   I don't know.
15   Q.   Are you testifying, are you not sure
16  because you do have a recollection of seeing some?
17   A.   No, it's because I don't know.  I don't
18  check it on a regular basis.  I don't recall ever
19  reading anything about any of that.  I usually
20  don't even pay it much attention, to be honest,
21  that is why I was hesitating because I really
22  don't recall anything.  I'm trying to think back
23  if I ever read anything.  And I don't recall
24  anything.
25   Q.   Are there any other social media groups

Page 40

1  that you belong to that relate to corrections?
2    A.   No.
3    Q.   Do you have a Twitter account?
4    A.   No.
5    Q.   Instagram?
6    A.   No.
7    Q.   Snapchat?
8    A.   Not any more.
9    Q.   Any other system that social media that
10  you use?
11   A.   Pinterest.
12   Q.   Do you make any posts related to work on
13  Pinterest?
14   A.   No.
15   Q.   Are you Facebook friends with any of the
16  defendants in this case?
17   A.   What I can think of, Edwards and Nicole.
18  I think I might be friends with Troy Singleton,
19  but other than that, I don't think anyone else.
20   Q.   Can you tell me where you're from?
21   A.   Lincoln, Illinois.
22   Q.   And do you still live in Lincoln?
23   A.   Yes.
24   Q.   Other than your cosmetology license,
25  have you attended or obtained any other post high

Page 41

1  school education?
2  **A.  No.**
3  Q.  Have you ever had any responsibilities
4  for PREA compliance or reporting?  By that, I
5  don't mean that like all staff are required to
6  report when someone complains about sexual
7  assault.  Instead I mean, a particular
8  responsibility as a PREA compliance manager?  Or
9  some special duty above and beyond what all staff
10  at IDOC have?
11  **A.  No.**
12  Q.  Have you ever been part of a team
13  responsible for auditing administrative or
14  institutional directives?
15  **A.  No.**
16  Q.  Have you ever been on the TACT team?
17  **A.  No.**
18  Q.  You've never worked in IA, correct?
19  **A.  Never.**
20  Q.  Have you ever had any responsibilities
21  for placement?
22  **A.  No.**
23  Q.  Have you ever had any responsibilities
24  for security classification or reclassification?
25  **A.  No.**

Page 42

1  Q.  Have you ever been subject to official
2  or unofficial discipline at IDOC?
3  **A.  No.**
4  Q.  Have you ever attended an employee
5  review hearing?
6  **A.  No.**
7  Q.  Do you belong to a union?
8  **A.  Yes.**
9  Q.  And what union do you belong to?
10  **A.  It's called local food and -- United**
11  **Local Food and Commercial Workers Union.**
12  Q.  Are there other folks at IDOC who belong
13  to that union?
14  **A.  I think there is one additional and she**
15  **is a cosmetology instructor.  We have a school.**
16  **And I run the shop.  That's at our facility.  That**
17  **I am aware of.**
18  Q.  And who is that other person?
19  **A.  Carol Parker.**
20  Q.  Has anyone to your knowledge ever
21  alleged that you sexually harassed one or more
22  prisoners?
23  **A.  Me?**
24  Q.  Correct?
25  **A.  No.**

Page 43

1  Q.  Has anyone to your knowledge ever
2  alleged that you sexually abused one or more
3  prisoners?
4  **A.  No.**
5  Q.  Have you received any awards during your
6  tenure at IDOC?
7  **A.  How many years?**
8  Q.  During the whole time you worked at
9  IDOC?
10  **A.  I've received employee of the month**
11  **twice on different occasions.**
12  Q.  Did you serve in the Armed Forces?
13  **A.  No.**
14  Q.  Do you receive a performance review?
15  **A.  Yes.**
16  Q.  From who?
17  **A.  Usually my immediate supervisor.**
18  Q.  Who is that?
19  **A.  It constantly is changing.  Right now I**
20  **am under the assistant warden of operations.**
21  Q.  Currently that's your direct supervisor?
22  **A.  Yes.**
23  Q.  What about in January and February of
24  2017?
25  **A.  I don't recall who my supervisor was.**

Page 44

1  I've had numerous supervisors.
2  Q.  How are you informed of the change?
3  **A.  Via e-mail usually.**
4  Q.  Who are the other types of supervisors
5  that you've had in terms of position?
6  **A.  Usually it's an assistant warden of**
7  **operations or an assistant warden of programs, and**
8  **if neither one of them are available I answer**
9  **directly to whoever the acting warden is.**
10  Q.  How are you supervised?
11  **A.  Through them.**
12  Q.  How does that work in practice?  To your
13  knowledge how do they assess your compliance with
14  IDOC policy?
15  **A.  I guess just through audits.  Review of**
16  **my paperwork.**
17  Q.  Do you participate in any regular
18  meetings?
19  **A.  Yes, monthly meeting.**
20  Q.  With whom?
21  **A.  Usually the AWO, AWP, and the wardens,**
22  **whoever is in there that day.  And whatever**
23  **supervisors are available.  Once a month we have a**
24  **meeting.**
25  Q.  And what is that topic of that meeting?

Page 45

1  A.  Usually the topic of any types of rules
2  that have been changed.  Any new staff that have
3  come in.  Or staff that have left.  Any
4  significant changes that's been made in the daily
5  production of the prison.
6  Q.  So, is that like I've seen warden's
7  minutes?
8  A.  That's what it is, yes.
9  Q.  So you attend the warden meetings?
10  A.  I attend, we have numerous different
11  ones.  We're all broke down because there's no way
12  we all attend the same.  I usually attend one that
13  is given by the assistant warden of operations or
14  the assistant warden of programs.  And
15  occasionally the actual warden.  Just depending on
16  how they have their meetings that month.
17  Q.  And like who else attends?
18  A.  Usually one department head from every
19  department.
20  Q.  What is the department that you head?
21  Is there a name?
22  A.  Just, that I'm the only beauty shop
23  employee.  I'm the only person.  There is no
24  other.  So I attend.  So if there's counselors,
25  whoever is in charge of those 12 counselors, they

Page 46

1  obviously all don't go.  Just whoever is in charge
2  goes.
3  Q.  Have you always been the only employee?
4  A.  As far as the beauty shop?
5  Q.  Yes.
6  A.  Yes.
7  Q.  Do you like the job?
8  A.  I love my job.
9  Q.  What do you love about it?
10  A.  It pays well.  I have retirement.  I go
11  to work at 7:30 to 4:00.  I don't work weekends.
12  It's a fulfilling job.  It's a very hard job.
13  It's somewhat of a stressful job.  But I like my
14  job.
15  Q.  Why is it stressful?
16  A.  The responsibilities.  There's a lot of
17  responsibilities.
18  Q.  Tell me more about that.
19  A.  Like I said earlier, signing the
20  offenders in and out, I might have eight to ten
21  offenders that I have to watch all the other
22  offenders that are coming in because they may not
23  be happy with that offender or they may not
24  actually like each other.  And then I have to make
25  sure I don't put them in a chair together.

Page 47

1  There's just a lot to be responsible for.
2  Q.  How do you make yourself aware of the
3  dynamic between prisoners that lead you to
4  schedule them with different people?
5  A.  A lot of the offenders are there for
6  considerable amount of time.  You get to know
7  their demeanor and their behavior.  Like I said,
8  usually they're well behaved the best that they
9  can be because they want to get a haircut.  So I
10  just have to observe.  I'm constantly just
11  watching and listening.
12  Q.  Are there records that reflect in the
13  past who got a haircut on a particular day?
14  A.  Yes.  There is, it's called a movement
15  sheet.  Call pass movement is what it's called.
16  And I am the one that actually inputs who's coming
17  on a particular day.  And a time.  I schedule
18  their time.  I schedule what they're getting done.
19  Q.  Do you know where those documents are
20  housed once the day is over?
21  A.  I turn them in to the placement and
22  assignments.
23  Q.  Have you ever received a negative
24  performance review?
25  A.  Never, no.

Page 48

1  Q.  Have you ever had an annual, or sorry,
2  quarterly performance review for any reason?
3  That's a bad question.  I'll strike it.
4  A.  I have a yearly evaluation every year.
5  Q.  Right.
6      (Whereupon, Deposition Exhibit No. 11
7  was marked for identification.)
8  Q.  The court reporter has handed you what's
9  been marked as Exhibit 11.  This is a training
10  summary that was given to us by your attorneys in
11  response to our request for a list of all
12  defendant's training.  Is this a document that
13  you're familiar with?
14  A.  Yes.  It's just a ledger, shows all of
15  the training I've had.
16  Q.  Okay.  And this is a type of document
17  that you've seen before?
18  A.  I don't recall that I've actually seen
19  it broke down like this.
20  Q.  What kind of training documents in terms
21  of a training summary do you typically see?
22  A.  Usually when we just go to our training
23  we sign something and date the time and date that
24  we are receiving and what it is.
25  Q.  Okay.  So to your recollection, you've

Page 49

1 never received a summary of all of the training
2 that you've gotten, correct?
3 **A. No.**
4 Q. Can you take a minute and review this
5 and let me know if you have any independent
6 recollection of receiving training from IDOC that
7 does not appear on this document as of January
8 3rd, 2019?
9 **A. Can you ask that question again?**
10 Q. I think this was run on January 3rd,
11 2009. So you may have gotten training after that
12 before today. But, are you aware of any training
13 that you got on or before January 3rd, 2019 that
14 does not appear on Exhibit 11?
15 **A. Formal training, where we sat in a**
16 **classroom, I don't think so. But they do updates**
17 **and policies with like the PREA, some of our**
18 **gender specific things. But no actual formal**
19 **training, no. 'Cuz I'm due again coming up for**
20 **my yearly training.**
21 Q. When was the last time that you had
22 cycle training?
23 **A. Looks like it probably would have been I**
24 **guess in '18. 'Cuz that's what the sexual**
25 **harassment and the stay three cycle training is.**

Page 50

1 **So it would have been 4-18.**
2 Q. That top entry, sexual harassment
3 training. Can you tell me what that is, if you
4 recall?
5 **A. That's pretty much just if we feel that**
6 **we're being sexually harassed or anyone is being**
7 **sexually harassed, the proper ways to report it.**
8 **And to make sure we report it. And the**
9 **consequences of not reporting it.**
10 Q. So that was training that bears on PREA?
11 **A. Yes, I think so.**
12 Q. Do you have any familiarity with PREA?
13 **A. Other than the posters that are**
14 **everywhere and the reporting it, I do know that we**
15 **have it everywhere in the prison for every**
16 **offender and every staff to see.**
17 Q. Tell me what you understand the policy
18 to require of you?
19 **A. Of me? If an inmate reported it to me?**
20 **Is to report it to the shift commander and an**
21 **incident report. And then they handle it after I**
22 **report it.**
23 Q. Have you ever completed, have you ever
24 called the shift supervisor to report a PREA
25 incident?

Page 51

1 **A. No.**
2 Q. Have you ever witnessed sexual activity
3 between two prisoners?
4 **A. No.**
5 Q. Have you ever been made aware of
6 romantic relationships between prisoners?
7 **A. Aware of more than gossip, no.**
8 Q. When you say more than gossip, tell me
9 what you mean by that?
10 **A. When you work in a room about this size**
11 **and you have 15 to 20 inmates with you all time**
12 **you hear things. But I've never conversed in it**
13 **with inmates.**
14 Q. Have you ever had a prisoner tell you
15 that they had a romantic relationship with another
16 prisoner?
17 **A. No. It's frowned upon, so they don't**
18 **usually tell the staff.**
19 Q. Have you ever heard of a sexual assault
20 occurring by one prisoner against another in any
21 case other than this one?
22 **A. Sexual or any type of assault?**
23 Q. Sexual assault.
24 **A. No, I don't think so, no.**
25 Q. This is the only sexual assault that

Page 52

1 you've ever heard of occurring at Logan between
2 two prisoners?
3 **A. I don't recall, 'cuz sometimes I don't**
4 **know if it's of a sexual nature or of actually**
5 **assaults. There is fights all the time. But when**
6 **it comes to sexual, I honestly don't think so.**
7 Q. Okay.
8 **A. I don't work around a lot of staff. I'm**
9 **with inmates all the time. And everything I**
10 **usually hear, I just hear it. I can't confirm or**
11 **really -- I don't engage in it. I just hear**
12 **things. But, I don't recall anything of any**
13 **sexual assaults on each other.**
14 Q. Do you as part of your regular job go to
15 any of the housing units for any reason?
16 **A. No.**
17 Q. Have you ever been to Housing Unit 8?
18 **A. Yes. Oh, to 8? There was one time**
19 **possibly. We were on a lockdown, but I don't**
20 **remember what unit I was on. We were asked to --**
21 **non-security staff was told to help pass out**
22 **meals. But, I don't remember what unit I went to,**
23 **if it was 7 or 8 or 6. It was one of those units.**
24 **But I don't remember. But there was no speaking**
25 **to the inmate. We just pushed the food to the**

Page 53

1  housing unit and left.  But going on a unit and
2  visiting or talking to and seeing inmates, no.
3    Q.   Can you tell me what if any of the
4  training that you received in Exhibit 11 dealt
5  with PREA?
6    A.   Obviously the sexual harassment.  I
7  think we cover a little bit in one of the cycle
8  training classes.  I think possibly the crisis
9  intervention, maybe something is discussed about
10  PREA in that.  And every staff meeting it's
11  reiterated again, over and over, and the
12  importance of documenting and reporting any
13  incident.
14    Q.   Any others?
15    A.   I think that's it.
16    Q.   When you say you covered a little bit in
17  cycle training, can you tell me the content of the
18  PREA training that you received?
19    A.   We're informed, there's English and
20  Spanish, that there's posters on the wall with a
21  number.  How we're supposed to properly report if
22  an offender tell us of any nature.  And basically
23  how to write the report and send it to the
24  supervisor.
25    Q.   Okay.  Do you receive any training

Page 54

1  outside of the administrative directive?
2    A.   No.  As far as my license?  Or just in
3  working in IDOC?
4    Q.   No.  For PREA training, you detailed
5  those steps that you're supposed to take in
6  response to the complaints.
7       Are you required to be familiar with
8  administrative directives in your role as an IDOC
9  employee?
10    A.   Yes, we are to be familiar with the ADs,
11  yes.
12    Q.   The cycle training that deals with PREA,
13  is there any training above and beyond that's in
14  the administrative directive?
15    A.   If there is, I'm unaware of that.  Maybe
16  for other people that do different jobs.  But for
17  my job, if an offender tells me something, all I
18  do is document the persons involved, document the
19  time and date and submit the paperwork to
20  security.  Then they handle the rest.
21    Q.   Got it.
22    A.   That's my part.
23    Q.   And have you ever, and the crisis
24  intervention, can you tell me what that generally
25  speaking deals with?

Page 55

1    A.   There was a brief period that I was
2  involved with the crisis intervention.  It became
3  to where I couldn't run the daily function of the
4  beauty shop because this was more time consuming
5  so I am no longer on the crisis intervention team.
6  It's basically similar to the PREA.  It's just
7  that if an offender is having a crisis, we
8  document the paperwork.  Submit it to security and
9  the mental health supervisors and then they
10  handle.
11    Q.   That's like a mental health crisis?
12    A.   Yes.
13    Q.   And what is the crisis intervention
14  team?
15    A.   It's a team of staff that intervene if
16  someone is having a crisis.  I don't really know
17  what else to say.
18    Q.   That's okay.  Can you tell me, is it
19  like a group of staff who have volunteered for
20  this additional responsibility?
21    A.   There is mental health professions that
22  is their job.  But we have to have significant
23  staff, that's 1,800 approximately offenders, they
24  obviously can't reach out to every offender.  So,
25  there's named staff that inmates know who they can

Page 56

1  go to if they're having an issue and report
2  something to them.  And then they document it, and
3  we make sure that they see the appropriate mental
4  health profession.
5    Q.   So tell me what of that training dealt
6  with PREA in any way?
7    A.   They kind of overlapped each other.  If
8  an offender came to me, this is the hypothetical,
9  if an offender came to me and told me that they
10  were on the unit and someone was touching them
11  inappropriately and now they feel depressed and
12  sad.  So then I just document exactly what they
13  said.  Then I report that, and then mental health
14  obviously looks over the mental health part and
15  then whoever is in charge of handling the security
16  part would handle the security because obviously
17  the other inmate is a threat to that inmate.
18    Q.   Okay.  So understanding that they
19  overlap in terms of how they might occur, was the
20  crisis intervention training specifically targeted
21  at PREA for any part of it?
22    A.   Like I said, it was brief for me because
23  it became to where I could not attend the training
24  and the hours.  So, I am no longer on the team.  I
25  guess I just didn't understand what you were

Page 57

1  asking me.
2  Q.  I'm just trying to understand the
3  universe of PREA training that you've received.
4  So my question is directed towards the crisis
5  intervention.  I understand how in practice mental
6  health crises and PREA might overlap.  But my
7  question is, did you actually get any PREA
8  training through this crisis intervention team
9  training?
10  A.  I don't know.  I don't think they
11  actually called it PREA, but it's just basically
12  if an offender is being physically threatened or
13  sexually threatened in any way, you have to report
14  it.
15  Q.  So that was just reiterating that other
16  training?
17  A.  Yes.  I don't think they actually called
18  it PREA.  Just the importance of reporting
19  anything.
20  Q.  And the monthly, you said that it's
21  mentioned at the monthly meeting?
22  A.  Occasionally, yes.  Everything is
23  mentioned at the monthly meetings.  Reporting any
24  unusual incidents.
25  Q.  Is there any -- so that's how it's

Page 58

1  reiterated?
2  A.  Usually.
3  Q.  To do your 434s?
4  A.  Yes, and it depends on who's holding the
5  meetings.  How the verbiage is.  It just depends
6  on who's talking at that particular meeting.  How
7  they say.  But usually any unusual events, which
8  is anything of that nature.
9  Q.  Have you ever received any training at
10  any point on preventing sexual assaults or sexual
11  harassment from occurring?
12  A.  I do not recall.
13  Q.  As you sit here today, you don't recall
14  any such training, correct?
15  A.  Not on preventing.
16  Q.  Have you ever received any training on
17  detecting sexual assault or sexual harassment that
18  is not voluntarily reported to you?
19  A.  I don't recall, no.
20  Q.  Have you ever been aware of a problem
21  with sexual misconduct by any population against
22  female prisoners at Logan Correctional Center,
23  correct?
24  A.  You mean staff and offenders, or
25  offenders and offenders?

Page 59

1  Q.  Either one?
2  A.  Well, when it's on the news or social
3  media or you see things on the news all the time.
4  Q.  Tell me what you mean by that.
5  A.  If you see a staff has been arrested or
6  walked off grounds, or being charged for
7  something, you see it on the news or in the
8  newspaper or whatever.  Is that what you mean?
9  Q.  I'm asking you whether you have ever
10  been made aware of a problem with sexual
11  misconduct at Logan from any source?
12  A.  That I have just been, no.
13  Q.  Okay.  Have you ever taken action in
14  response to a relationship between prisoners that
15  you believed to be inappropriate under IDOC
16  policy?
17  A.  No.
18  Q.  What is your understanding of IDOC
19  policy regarding relationships between prisoners?
20  A.  Any type of relationship or
21  inappropriate relationships?
22  Q.  Well, actually that's what I'm trying to
23  assess out, because I would assume that
24  friendships are okay?
25  A.  Yes.

Page 60

1  Q.  But sex between prisoners is not okay,
2  correct?
3  A.  No.  I assume it's not okay.
4  Q.  So what's your understanding of the line
5  between what is an appropriate relationship and
6  what is an inappropriate relationship?
7  A.  Anything that is unwanted from another
8  offender, obviously if they are not -- don't want
9  the relationship, then I guess it's not
10  appropriate.  There are relationships with
11  inmates.  They live together.  They work together.
12  They are incarcerated for a very long time.  I
13  can't say they're not going to have any type of
14  relationship.  But sexual, I'm not aware of any of
15  that stuff.  I don't go on the units.  I don't see
16  them interact in that manner.  I'm in a room
17  that's got one little window to see out in the
18  hallway of the other inmates that are coming back
19  and forth.  I don't see them interact in that way.
20  Q.  Were you made aware of a time when the
21  max unit in Housing Unit 15 closed and the women
22  housed there were dispersed throughout the prison?
23  A.  I do recall that briefly, yes.
24  Q.  Tell me how you were made aware of that?
25  A.  Just the moves.  When there was a bunch

Page 61

of moves. But as far as anything else, I don't
know really what was going on or why it was going.
But they were just moving offenders around. But
that's a daily occurrence at Logan.

Q. When was the max unit closed, ball park?

A. I don't know. I didn't even know it was
actually -- you are using the word closed, because
there's still inmates that live there, so I don't
think it's closed. There's inmates that live
there.

Q. No, it's my understanding from the prior
deposition that the max unit as max unit, in other
words, the units used as a housing unit
specifically for maximum security prisoners was
closed, and it then became -- I think the
testimony was that it was intake, or it's still in
use, but not as a housing unit specifically for
maximum security prisoners.

So with that in mind, were you made
aware at some point that the max unit was closed
as a housing unit for maximum security prisoners?

A. No. Because as far as I know there's
still inmates that are max that live there. I
don't think that it's closed to all max inmates.
I think there are max inmates that still live

Page 62

there. But I don't know that to be certain. 'Cuz
it's like an "X" house. And then there's wings
and there's the segregation and the intake and
then there's the other wing that I think just
whoever lives there, lives there.

Q. But you did hear about something about
that unit?

A. Yes.

Q. And can you give me some estimation of
what time that was?

A. Probably a couple years ago. I'm going
to say 2-17.

Q. And were you aware of an uptick in
problems throughout the prison following the
closure?

A. No. No. Not really, no.

Q. You weren't made aware of any problems?

A. No.

Q. Do you recall Haley Heilman raising a
problem with her anticipated roommate, correct?

A. Yes. But at that time I don't recall
where or -- where it came from, I don't know where
she lived. I don't usually know where these
offenders live, what housing units they're on,
because I don't go on the housing unit.

Page 63

Q. Do you know whether or not the time that
Haley Heilman raised problems with her anticipated
cell mate was the same time that the max unit was
closing?

A. I'm guessing because that's about the
time that she worked for me, right? About that
time?

Q. Was that your recollection?

A. Yes.

(Whereupon, Deposition Exhibit No. 12
was marked for identification.)

Q. The court reporter has handed you
what's been marked as Exhibit 12. This is a copy
of the interrogatory responses that were served on
us by your attorneys. The second to last page is
a page called a declaration. Do you see that?

A. Yes.

Q. Is that your signature that appears
there?

A. Yes.

Q. And according to the declaration this
signature reflects that you've read the responses
to the interrogatories and that they are correct
and complete to the best of your knowledge and
belief?

Page 64

A. Yes.

Q. Did you review these interrogatory
responses before signing this document?

A. Yes.

Q. And you reviewed them again in
preparation for your deposition today, correct?

A. Yes.

Q. And are they complete and accurate to
the best of your recollection?

A. Yes.

Q. I want to direct your attention to the
response that you gave to interrogatory number
three. You say that you recall Plaintiff
expressing concern with other prisoners that
Jennifer Fleming was going to be moving in because
she is loud and obnoxious. Do you see that as
part of your response?

A. Yes.

Q. Is that verbatim what she said?

A. Yes. It's just that when she -- I can
not remember every detail, but there was a
conversation she had with other offenders in the
room, in the beauty shop, in the beauty shop, that
she couldn't sleep or it was loud and she was loud
and obnoxious, and carrying on about her roommate.

Page 65

1    So, I think this, when it says not on
2  the day of, because I think Fleming was already
3  probably her cell mate, which I don't know that
4  she was in a two man, four man, six man; I don't
5  know how many other offenders were in her cell
6  with her.
7    And I just remember making a comment
8  that I was sorry that they had to sometimes live
9  with offenders that didn't respect other offenders
10  had to get up and go to work the next day. That's
11  pretty much the conversation we had.
12  Q.   Where was she standing?
13  A.   In the beauty shop.
14  Q.   And how many other people were there
15  with her?
16  A.   Probably the other workers that were in
17  there, and however many appointments I had. But I
18  do not recall exactly how many people were in
19  there, offenders were there, that particular day.
20  Q.   Well, it's your testimony that you
21  recall that she said loud and obnoxious and not
22  other words to describe Jennifer Fleming, correct?
23  A.   Correct.
24  Q.   Do you remember the exact words that she
25  used during that conversation?

Page 66

1  A.   Basically, that was it. Just annoying,
2  loud and obnoxious.
3  Q.   Right. But you told me earlier today
4  that you actually don't recall Haley Heilman at
5  all, correct?
6  A.   I thought you just meant -- I don't
7  really remember her as a person. But I remember
8  the girl, and she worked for me for a very brief
9  time. I wish I had the dates that she worked for
10  me. I didn't know her very well. She had only
11  started working for me. And they only work
12  approximately four to six hours. So, when the
13  inmates comes in they work. I don't know them. I
14  don't get personal with them usually.
15  Q.   So, is it your testimony now that you do
16  recall -- you do have an independent recollection
17  of Haley Heilman?
18  A.   Of this conversation, yes.
19  Q.   That's not my question. Do you have an
20  independent recollection of Haley Heilman?
21  A.   Yes.
22  Q.   Tell me everything that you recall about
23  her?
24  A.   Just that she worked for me briefly.
25  That's it. I don't remember, I don't even

Page 67

1  remember what she looks like. I thought that's
2  what you meant. Like, what does she look like?
3  What was she like? I don't even remember any of
4  that. I wouldn't know her if I saw her. I don't
5  remember what she looks like.
6  Q.   And you testified earlier, well, it's a
7  highly common occurrence for women in the beauty
8  shop to discuss problems that they have with other
9  women, correct?
10  A.   Other offenders, yes.
11  Q.   That happens every single day that
12  you're at the beauty shop?
13  A.   Every single day.
14  Q.   Multiple times per day, right?
15  A.   All day long.
16  Q.   So you don't recall what Haley Heilman
17  looks like, correct?
18  A.   No.
19  Q.   You don't recall anything about her
20  other than this single conversation, correct?
21  A.   I remember that she's Caucasian. That's
22  about -- I don't really remember. I don't
23  remember her eye color. I don't remember her
24  physique. I don't remember.
25  Q.   But it's your testimony that you can

Page 68

1  recall that on the day on or around the day that
2  Jennifer Fleming moved into her cell she used the
3  words verbatim, loud, obnoxious and annoying?
4  A.   Yes.
5  Q.   Despite the fact that conversations like
6  that happened multiple times every single day,
7  correct?
8  A.   Yes. Because I'm not engaging in the
9  conversation. I'm doing my job and I hear all of
10  them over here talking while I'm documenting
11  shears and paperwork times people come in, times
12  people go out.
13  Q.   So that's why it stood in your mind,
14  because you got involved in this conversation?
15  A.   Just because I was like, well, I'm sorry
16  that you guys -- it wasn't even directly to
17  Heilman. It was just a general conversation; I'm
18  sorry, guys, that you have to live with other
19  offenders so you don't get your sleep to get up
20  and come to work. That type of a conversation.
21  Q.   Why did you get involved in this
22  conversation if you've never gotten involved in
23  another conversation before?
24  A.   Just because they were just talking
25  loudly and I just said it. I don't know why I

Page 69

1  did.  I just made a comment to them.
2  Q.   Is this the only loud conversation that
3  you've had in the beauty shop about other
4  prisoners being a problem?
5  A.   No.
6  Q.   So why did you get involved in this one?
7  A.   I don't know.  I just made a comment.
8  Q.   And that's the only reason this stood
9  out in your mind is that you made this general
10  comment about how expressing sympathy for
11  prisoners having to come to work without getting
12  much sleep?
13  A.   Because it is difficult for the ones
14  that are trying to work.  They don't get sleep
15  because other offenders don't have assignments.
16  They stay up at night.  This is just a general
17  summary of what I've dealt with over the years
18  with offenders being tired when they come to their
19  assignments because they might be housed with an
20  inmate that doesn't have a job and stays up all
21  night.  And they have to get up and come to work.
22  So I just briefly remember that conversation.  And
23  then telling her something, not just her, the
24  girls, that I'm just sorry that you guys have to
25  deal with this conversation.  I mean, deal with

Page 70

1  this noise and the way you have to live.
2  Q.   So this wasn't even a concern that you
3  were expressing to Haley?  This was a generalized
4  --
5  A.   Just a general conversation to the shop.
6  The girls.  Anyone that was listening.
7  Q.   So what about that conversation
8  concerned you enough to make a call to a
9  correctional officer to inquire further?
10  A.   I don't recall making any phone call to
11  a correctional officer.
12  Q.   But you don't dispute that you did that,
13  correct?
14  A.   I don't recall it.  I don't dispute it,
15  but I don't recall it at all.  I make phone calls
16  all day long, trying to find inmates, find out,
17  calling over to interview them.  Call them over to
18  get a haircut.  I deal with seg inmate.  I deal
19  with mental health inmates.  I'm on the phone
20  looking for inmates a lot.
21  Q.   How many times have you made phone calls
22  to raise an alarm about a prisoner who has
23  reported issues with another prisoner?
24  A.   Over all my years or just this
25  particular?  Never for this particular one, but --

Page 71

1  I don't recall.  I don't know.  Never anything
2  serious of this nature.  I've never called IA, if
3  that's what you're asking.
4  Q.   I'm asking whether you have ever made a
5  call to a correctional officer, I mean you said
6  again you get multiple -- you overhear multiple
7  complaints about female prisoners regarding other
8  female prisoners' behavior, correct?
9  A.   Yes, but my phone calls is only for
10  like -- say I need this inmate.  I call the unit
11  to get them to come get their hair cut.  I'm not
12  calling to discuss anything about that.  Is that
13  what you're asking me?
14  Q.   Right.  So other than this one that you
15  testified you don't recall doing, have you ever
16  made a phone call to a correctional officer to
17  report a concern?
18  A.   No.
19  Q.   About a prisoner's issue with another
20  prisoner?
21  A.   No.
22  Q.   Did you ever take any other action to
23  address any issues between Plaintiff and Jennifer
24  Fleming?
25  A.   Can you repeat that?

Page 72

1  Q.   Did you take any other actions that you
2  have not talked about today regarding plaintiff's
3  issue with Jennifer Fleming?
4  A.   No.
5  Q.   Have you ever been convicted of any
6  crime?
7  A.   No.
8  Q.   As a licensed cosmetologist, you are a
9  mandatory reporter, is that correct?
10  A.   That has just became a law.  So my
11  license are to be renewed in September.  So, I
12  have to take a one hour domestic violence
13  training.  So every two years I have to renew my
14  license.  So mine will be due in September of this
15  year.
16  Q.   So, in January and February of 2017 you
17  were not a mandatory reporter?
18  A.   No.
19  Q.   Did you have to receive additional
20  training in order to renew your license now that
21  you're a mandatory reporter?
22  A.   I will.  That's the training I will have
23  in September.
24  Q.   Is that training provided to you by IDOC
25  or someone else?

Page 73

1    A.   No, I pay for it myself.  I pay for all
2  my continuing education, licensing, and now this
3  new law that is domestic violence training
4  required by our licensing.
5    Q.   You don't dispute that the sexual
6  encounter that occurred between Haley Heilman and
7  Jennifer Fleming was unwanted and unconsented to
8  by Haley Heilman, correct?
9    A.   Can you repeat that?
10   Q.   Do you dispute that Haley Heilman did
11  not consent or want the sexual interaction that
12  occurred with Jennifer Fleming to occur?
13   A.   I'm going to say no, but that's hard for
14  me to know.  I don't know.  No.  I don't dispute
15  it.  I don't have any knowledge to say yes or no.
16   Q.   Got it.
17       (Whereupon, Deposition Exhibit No. 13
18  was marked for identification.)
19   Q.   The court reporter has handed you what's
20  been marked as Exhibit 13.  This is a report of
21  the adjustment committee following the
22  disciplinary ticket to Jennifer Fleming for sexual
23  assault of Haley Heilman.  Let me first ask, are
24  you familiar with this type of document?
25   A.   No.  I don't, this is not -- this is not

Page 74

1  even me.  I was not the reporting officer.
2    Q.   Okay.  So, you're listed here on the
3  first page of Exhibit 13 as the incident officer.
4    A.   But it's not me.
5    Q.   So it's your belief that that's a
6  mistake?
7    A.   That's a mistake.  It should probably be
8  Nicole.
9    Q.   I think you're probably right.  So, have
10  you ever -- do you have the power to issue a
11  disciplinary ticket?
12   A.   No.  I can write a ticket.  But, I don't
13  have any authority over the actual discipline.
14  All I can do is write the incident.  What
15  occurred.  Then I submit it to security.  Then
16  they decide.  I have no authority after that.
17   Q.   Okay.  And I think that person who
18  writes the incident is still typically listed as the
19  incident officer?
20   A.   Right.
21   Q.   But it's your testimony that you did not
22  write Jennifer Fleming a disciplinary ticket for
23  sexually assaulting Haley Heilman, is that
24  correct?
25   A.   Yes.  I did not.

Page 75

1    Q.   Okay.  Have you ever written either an
2  incident report or a disciplinary ticket to a
3  prisoner for an inappropriate relationship with
4  another prisoner?
5    A.   No.  I do not recall.  I have worked for
6  corrections since 1995, but I've never witnessed a
7  sexual, so I know I've never written one.  A
8  sexual.
9    Q.   Well, but like an inappropriate
10  relationship even if it's consensual?
11   A.   No.
12   Q.   Have you ever taken any action in
13  response to a relationship between two prisoners
14  that you believed was inappropriate under IDOC
15  policy?
16   A.   No.
17   Q.   Do you agree that when a prisoner
18  reports that they're having issues with their cell
19  mate, that more investigation is required to
20  understand whether those issues are serious or not
21  serious?
22   A.   Do I agree with, that it should be a
23  policy?
24   Q.   Correct.
25   A.   Yes.

Page 76

1    Q.   Do you agree that the policy requires
2  additional questions or investigation when a
3  prisoner reports an issue with a cell mate in
4  order to understand whether that issue is a
5  serious one or not?
6    A.   Yes, I think everything should be looked
7  at.
8    Q.   Well, but that some additional action
9  should be taken?
10   A.   Are you just saying in general if
11  something happens, or are you talking about this
12  particular case?
13   Q.   No, I'm talking about what IDOC policy
14  requires.  So if a prisoner comes to a staff
15  member, and says I'm having an issue with my cell
16  mate, do you agree that IDOC policy requires at
17  minimum a follow-up question to understand what
18  the issue is so that a determination as to the
19  seriousness of that issue can be addressed?
20   A.   Yes.
21   Q.   Do you play any role in the grievance
22  process at Logan?
23   A.   No.
24   Q.   Have you ever been made aware of any
25  grievances against you?

Page 77

1   A.  I think on one occasion I had a
2  grievance for a haircut.  But nothing of this
3  nature.  But I can't recall the exact date or the
4  actual grievance.
5   Q.  Like someone saying that you gave them a
6  bad haircut?
7   A.  That another inmate may have given them
8  a bad haircut, or it took too long to get in.  But
9  nothin' -- like this.
10   Q.  But have you ever had, other than that
11  haircut incident?
12   A.  No.
13   Q.  Have you ever had any other grievances?
14   A.  No.
15   Q.  I think you said today was your first
16  deposition?
17   A.  Ever, yes.
18   Q.  Have you ever been named as a defendant
19  in a lawsuit?
20   A.  Never, no.
21   Q.  Have you ever filed a lawsuit?
22   A.  No.
23   Q.  Have you ever filed a grievance about
24  the conditions of your employment at IDOC?
25   A.  A grievance about my conditions?  No.

Page 78

1   Q.  Have you ever filed any sort of a
2  grievance related to your employment at IDOC?
3   A.  No.
4   Q.  Have you ever testified in court before?
5   A.  Does my divorce count?
6   Q.  It does.
7   A.  Yes.
8   Q.  Just the one time?
9   A.  Yes. Well, actually I guess another
10  time.
11   Q.  There was another time?
12   A.  Yes.
13   Q.  What was the other time?
14   A.  Prior to my divorce.  An order of
15  protection.
16   Q.  Okay.  That wasn't related to your role
17  as an IDOC employee, correct?
18   A.  No.
19     (Whereupon, Deposition Exhibit No. 14
20  was marked for identification.)
21   Q.  The court reporter is handing you what's
22  been marked as Exhibit 14.  Are you familiar with
23  this type of document?
24   A.  Yes, this is my time sheet.
25   Q.  I do want you to look it over and let me

Page 79

1  know if you have any reason to dispute this is an
2  accurate reflection of the hours that you worked
3  in 2017.
4   A.  I'm sure everything is fine.
5   Q.  I don't need you to like look at every
6  single day.  I just want you to maybe review it as
7  a general matter and let me know if there's
8  anything from a memory that you have in your mind?
9  Like, for example, I know I took vacation in June
10  and it doesn't show up there.  That leads you to
11  believe this is not an accurate reflection?
12   A.  It seems fine.
13   Q.  Were you ever interviewed by anyone as
14  part of the investigation into Haley Heilman's
15  sexual assault?
16   A.  You mean at IDOC?
17   Q.  Well, leaving to the side your
18  attorneys.
19   A.  No.
20   Q.  Anybody?
21   A.  No.
22   Q.  Did you ever talk with -- were you aware
23  that Nicole Veech participated in that
24  investigation?
25   A.  Only because she was acting internal

Page 80

1  affairs.  And I know that they're the ones that
2  investigate an unusual incident.  So, yes, I was
3  aware of that.
4   Q.  Did you ever talk with her about it?
5   A.  No.
6   Q.  And you were never interviewed?
7   A.  No.
8   Q.  By anybody as part of that
9  investigation?
10   A.  No.
11   Q.  Correct?
12     (Whereupon, Deposition Exhibit No. 15
13  was marked for identification.)
14   Q.  The court reporter has handed you what's
15  been marked as Exhibit 15.  This is an answer to a
16  now amended complaint in this case.  This is a
17  document that was filed on your behalf by your
18  attorney who at the time of this filing was
19  Jeffrey Shuck.  I want to draw your attention to
20  paragraph 22, which is on page nine of this
21  document.
22   A.  Which one?
23   Q.  Paragraph 22, if you would take a moment
24  and review the allegation that is laid out in
25  paragraph 22 as well as the answer that's written

Page 81

1  there.
2  **A.   Basically just reiterating, I'm sorry,**
3  **about inmates having to live with other inmates**
4  **that are loud and obnoxious and don't respect**
5  **other inmates that have to go to their jobs.  I**
6  **have no way of intervening with Fleming so I don't**
7  **know -- that part, no.  But the rest, yes.**
8  Q.   Okay.
9  **A.   So, sorry.**
10  Q.   Yes.  So, but this answer is slightly
11  different in a couple ways.
12      So, in this answer, the statement is
13  that, Plaintiff mentioned that Fleming was coming
14  to her cell directly to you.  Do you see that?  It
15  says, Plaintiff mentioned it to defendant Annette
16  Veech.
17  **A.   That she was coming directly to her**
18  **cell?**
19  Q.   No.  Earlier you testified that you had
20  just in fact overheard Heilman?
21  **A.   Yes.**
22  Q.   Complaining to a whole bunch of other
23  people?
24  **A.   Yes.**
25  Q.   But here you agree with me that the

Page 82

1  statement is that Plaintiff mentioned it to you?
2  **A.   I guess it was a misunderstanding.  It**
3  **was just in general; me, the shop.**
4  Q.   Okay.
5  **A.   Her and I never had a one-on-one**
6  **conversation ever.**
7  Q.   So you dispute that she and you
8  discussed anything one-on-one?
9  **A.   I dispute that, yes.  That never**
10  **happened.**
11  Q.   So the statement is incorrect that
12  Plaintiff mentioned it to you?
13  **A.   Yes.  It was a general conversation**
14  **amongst numerous people.**
15  Q.   And earlier you testified that you just
16  said generally to the people in the unit, oh,
17  gosh, I'm so sorry that happens, that people
18  aren't able to sleep.
19      But, in this statement, you agree that
20  the answer indicates that you told Plaintiff that
21  you were sorry?
22      MS. BOYLE:  I'm going to object to
23  mischaracterization of testimony, but you can
24  answer.
25  **A.   I never -- I forgot what I was going to**

Page 83

1  say.  I never was on the unit.  This occurred in
2  the beauty shop.  Never was I on a unit with her.
3  Is that what you said?
4  Q.   No.  What I had said was, earlier I
5  believe it was your testimony that when we were
6  looking at your interrogatory that your
7  independent recollection was of speaking generally
8  to the group that you were sorry that people
9  couldn't get enough sleep, right?
10  **A.   Basically, yes.**
11  Q.   And that's your independent
12  recollection?
13  **A.   And that I did say that it was**
14  **unfortunate and I was sorry that you can't get**
15  **sleep if you have to live with people that are**
16  **loud or obnoxious like Ms. Heilman said.**
17  Q.   But this is all based on your
18  independent recollection, correct?
19  **A.   Yes.**
20  Q.   You're not relying on what you wrote or
21  what is written here; this is a memory in your
22  mind?
23  **A.   Yes, that is what I just remember that**
24  **general, brief conversation amongst numerous**
25  **people in the shop.  Never did Haley and I just**

Page 84

1  sit and have a conversation, converse with the two
2  of us about any of this.
3  Q.   Can you tell me anybody else who was
4  present for that conversation?
5  **A.   Only offenders, but as far as names, no.**
6  Q.   But you remember that it was Haley?
7  **A.   Well, because she worked for me at that**
8  **time.  I mean, she worked and I think I may have**
9  **had an offender named Nolan McQue possibly because**
10  **I just remember who worked for me at those times.**
11  **I think maybe an offender named -- I don't**
12  **remember their names.  I don't know.  No.**
13  Q.   Well, the difficulty I'm having in
14  understanding your testimony is that you testified
15  that Haley worked for you for a very brief time,
16  right?
17  **A.   Right.**
18  Q.   And yet you remember that she was the
19  one who made this comment and it was about her
20  cell mate that this discussion was occurring,
21  right?
22  **A.   Right.  Yes.**
23  Q.   And yet, there were other people who
24  were part of that conversation that also worked
25  for you, right?

Page 85

1    A.  Yes.
2    Q.  'Cuz Haley would never have been in your
3  shop alone because by your own testimony you would
4  never have been having a one-on-one conversation
5  with her, right?
6    A.  Right.  She was not in there alone.
7    Q.  There were other people who worked who
8  were also participating in this conversation?
9    A.  There were other offenders who were
10  gutting their haircuts; customers.
11    Q.  Both customers and workers?
12    A.  Yes, all offenders, no staff.
13    Q.  Can I ask you why do you refer to them
14  as offender?
15    A.  Because some people use inmates, some
16  people use offender.
17    Q.  Is there a reason that you chose
18  offender?
19    A.  I just think it's more appropriate.
20    Q.  Why?
21    A.  Because they're an offender.  I mean,
22  they have committed a crime and they're
23  incarcerated.
24    Q.  Does that impact why you --
25    A.  The word "inmate" just seems a little

Page 86

1  more harsh, so I just choose to use the word
2  "offender".
3    Q.  Okay.  So, there were other people
4  participating in this conversation, and that were
5  other people who worked for you, correct?
6    A.  Yes.
7    Q.  But you can't remember any of their
8  names?
9    A.  At that given time, no.  I don't
10  remember who was working for me on that particular
11  date or that particular time.  Because sometimes I
12  might have eight workers work for me, but one may
13  be on a call pass somewhere else or one might be
14  on a visit or one might be on somewhere.  I don't
15  recall who was in the shop at that particular
16  time.
17    Q.  Even though all of the other people who
18  worked for you at that time would have worked for
19  you for a longer period of time than Haley Heilman
20  did, correct?
21    A.  I don't recall that.  I don't recall the
22  dates.  There may have been one other person that
23  worked about the same amount of time.
24    Q.  Nolan McQue is one of the people?
25    A.  I'm sure she might have worked for me.

Page 87

1  A Villareal possibly worked for me then.  Possibly
2  a Buchanon.  I'm just trying to recall '17.  Right
3  off the top of my head, those are the only ones I
4  can recall that possibly were working for me then.
5  And I could be wrong about that too.
6    Q.  Is there a document that would show me
7  who worked for you during that time?
8    A.  I don't know exactly what it's called,
9  but it's an assignment detail.  It's an assignment
10  sheet that tells what offender worked where and
11  their dates that they worked.
12    Q.  Is there any other, when Jennifer
13  Fleming comes to get her hair cut, at any point in
14  time during the period of time she's been coming
15  to you to get her hair cut, have you ever
16  endeavored to keep her away from certain prisoners
17  as you said that you do with some?
18    A.  No.  Keep them away, like don't let them
19  --
20    Q.  You testified there was some people you
21  come to learn have problems interacting with each
22  other so you work to schedule that prisoner with a
23  different person so they don't end up in the same
24  chair?
25    A.  Well, that is a general rule for

Page 88

1  throughout the whole department.  If they have a
2  keep separate -- there's certain inmates that if
3  another inmate has filed a -- if there's tickets
4  where they have fought or something, but it will
5  show up that those inmates can't be together.
6        So I would never -- like if she was an
7  offender that had previously been in an
8  altercation with you, I obviously am not going to
9  bring them in and let her cut your hair.  So I
10  would have to remove my worker from the beauty
11  shop while that offender came in and got their
12  hair cut.  The same as they can't be in a
13  classroom together, or they can't be in the chow
14  hall together, or they can't be certain places
15  together.
16    Q.  People who have KSFs are not allowed to
17  be in the same room together?
18    A.  Right.
19    Q.  What I understood your testimony to be
20  was a little less formal than that.  I understood
21  your testimony to be, and correct me if I'm wrong,
22  was that notwithstanding the lack of a KSF, if you
23  come to learn that one prisoner has an
24  interpersonal problem with another one, that you
25  do your best to make sure that that person doesn't

Page 89

1  get scheduled with that worker to create the
2  possibility of conflict, and instead you will
3  schedule them on another seat in another chair; is
4  that not a correct statement of your testimony?
5  **A.  I've never had to do that.  But if I had**
6  **to, I would.  Because normally, like I said, they**
7  **come in, they know they need their hair cut.  I**
8  **usually will allow them to pick who they want to**
9  **cut their hair if that person is available.  So if**
10 **an offender came in and I signed them in, and if**
11 **there was available, then I will tell them**
12 **to go to station one or station two.  And**
13 **sometimes you get that um, and then I'm like well,**
14 **station two is open.  They will go sit in a chair.**
15 **I don't usually have a problem.**
16 Q.  So you haven't had to --
17 **A.  Remove anyone for someone.**
18 Q.  Okay.
19 **A.  Is that what you're asking me?**
20 Q.  Yeah.  Looking back at Exhibit 15, if
21 you would turn to page ten, and read allegation
22 paragraph 26 on page ten.  And the response at the
23 top of page 11.
24 **A.  Okay.**
25 Q.  The allegation in paragraph 26 is that

Page 90

1  Plaintiff reported her fears about Jennifer
2  Fleming to you.  Do you see that that is -- do you
3  agree that that is a correct summary of the
4  allegation?
5  **A.  No.  Because she did not report to me.**
6  **If she would have came to me and said Ms. Veech,**
7  **this offender is doing this, this and this.  To**
8  **me, that's reporting something to me.  Having a**
9  **general conversation with other offender is not**
10 **reporting something to me.  Is that what you're**
11 **saying?**
12 Q.  Well, you jumped to my next question.
13 That's fine.  You agree that this allegation, I
14 understand you dispute it.   You agree that this
15 allegation says that she reported her fears of
16 Jennifer Fleming to you?
17 **A.  I understand that she is saying that.**
18 **Yes.**
19 Q.  Okay.  And it's your testimony that she
20 did not do that, correct?
21 **A.  No, she did not.**
22 Q.  And I understand that you just gave some
23 testimony about what you would have done, had she
24 done that.  But you've never actually done that,
25 correct?

Page 91

1  **A.  No, I did not report anything.**
2  Q.  And that in your tenure with the IDOC
3  you've never reported?
4  **A.  Ten years, it's been -- I'm in my -- a**
5  **little over 24 years.**
6  Q.  And you've never filed a PREA report,
7  correct?
8  **A.  No, I've never filed a PREA.**
9  Q.  And is it your testimony that you
10 dispute that Ms. Heilman told you that she felt
11 unsafe with Jennifer Fleming?
12 **A.  She never told me that, no.  I dispute**
13 **that, yes.**
14 Q.  And you agree that IDOC policy would
15 have required you to take action to immediately
16 report that to a shift supervisor?
17 **A.  Yes.**
18 Q.  You dispute that you told Haley Heilman
19 you would take action when you returned on Monday?
20 **A.  No.  I did not say that to her.  That's**
21 **the first I've heard that.**
22 Q.  Well, just to be clear, this is all to
23 the best of your knowledge, right?
24 **A.  Uh-huh.**
25 Q.  Is that a yes?

Page 92

1  **A.  Yes.**
2  Q.  Because, for example, it's your
3  testimony that despite not disputing it, you don't
4  recall a conversation that you had with Justin
5  Gannon, correct?
6  **A.  I do not recall having a conversation**
7  **with officer -- Sergeant Gannon.**
8  Q.  Okay.  Let's take a few minutes.
9  (A break was taken at 3:19 p.m.)
10 (Deposition resumed at 3:28 p.m.)
11 **MS. GRADY:** Back on the record.  I don't
12 have any further questions.
13 **MS. BOYLE:** I'll have a few follow-up
14 questions.
15 EXAMINATION BY
16 **MS. BOYLE:**
17 Q.  Do you recognize voices of the workers
18 in your beauty shop?
19 **A.  If they work for me for a very long time**
20 **I might.**
21 Q.  So if you had a worker that worked for
22 you for a long extended period of time, you might
23 not be able to recognize what they look like, but
24 their voice you could possibly recognize?
25 **A.  Possibly.**

Page 93

1    Q.   Would you be able to recognize Haley
2  Heilman's voice if she stood behind you?
3    A.   No.
4    Q.   No?  Okay.  So, I believe counsel asked
5  you earlier why does this conversation that
6  happened in the beauty shop stick out in your
7  mind, correct?
8    A.   I only remember it because after reading
9  this, and then obviously of what happened to her,
10  after reading the lawsuit, I had no idea all of
11  that had happened to her.
12    Q.   So, other than being informed after the
13  incident happened, you just knew her as a girl who
14  worked in your shop for an extended period of
15  time, but nothing remarkable necessarily?
16    A.   She worked for me for a very short
17  amount of time.  Very short period of time.
18    Q.   Less than six months?
19    A.   Less than a month.  Like a week and a
20  half, maybe two weeks max.
21    Q.   Is that atypical or common?
22    A.   She probably would have continued to
23  work for me if the incident hadn't occurred.  But,
24  once the incident occurred, she was removed from
25  her assignment because as far as I know she was

Page 94

1  removed completely from the facility.
2    Q.   So, that was your understanding is that
3  she was removed from her assignment because she
4  was moved to a different facility.
5    A.   Yes.  Because of this incident.
6    Q.   Okay.  Sure.  The date that the incident
7  happened, would there be some kind of
8  documentation of all of the offenders in your
9  beauty shop at that time?
10    A.   The date that her assault happened?
11    Q.   Excuse me.  I should clarify.  The date
12  of the conversation, if you remembered it?
13    A.   There will be a list of all of the
14  offenders that were in my shop that day.  And
15  there would be a list of all the workers that day,
16  but the given minute that the conversation
17  occurred, that would not; I mean, the day.
18    Q.   Sure.
19    A.   But I don't even know what day that
20  occurred.
21    Q.   So, but there would be some
22  documentation of every offender that was in your
23  beauty shop at any point in time, along with
24  documentation of every worker that was in your
25  beauty shop at any certain period of time?

Page 95

1    A.   Yes, on every given day I work
2  everything is documented from the time an inmate
3  comes in until they leave.  Offender workers and
4  offender customers.
5    Q.   So if we were to pull a date and give
6  you a list of all the people in there, you
7  wouldn't dispute those were the people in there on
8  that date?
9    A.   No, I wouldn't dispute it if it's
10  documented that they were there.
11    Q.   My other question is, you testified
12  earlier that if you were ever made aware of a
13  conflict of any type between offenders in your
14  shop, whether that be workers and people --
15  customers who got there, you would have done
16  something had you had known, correct?
17        MS. GRADY:  Objection.  Foundation.
18    Q.   You can answer.
19    A.   Oh, I would always report any unusual
20  incident because we're trained to report anything.
21  And in fact, we are disciplined if we don't report
22  something of this nature.
23    Q.   What kind of discipline do you get if
24  you don't report it?
25    A.   I've never been disciplined so I don't

Page 96

1  know.  But I do know that you can be disciplined
2  if we know something and we don't report it,
3  whether it's staff or an inmate.
4    Q.   To your understanding, or based on your
5  experience working at IDOC, what do you understand
6  that discipline to be?
7    A.   Days off.  Or even possible job loss if
8  it's significant or severe.
9    Q.   Okay.  Do you have any follow-up?
10        MS. GRADY: I do.
11        FURTHER EXAMINATION
12        BY MS. GRADY
13    Q.   So I want to talk to you first about
14  this independent recollection.  You recall that
15  during the time that I was asking you questions, I
16  asked you several times that the reason this
17  conversation stood out in your mind.  Do you
18  remember me asking you those questions?
19    A.   Yes.
20    Q.   And you never mentioned about that the
21  reading of the lawsuit or anything related to the
22  lawsuit was part of the reason why it was jogged
23  in your mind, right?
24    A.   I guess I just -- I don't understand the
25  question really.  I don't understand what you're

Page 97

1  asking me.
2     Q.    I just asked you, do you agree that in
3  response to my multiple questions about why this
4  incident stood out in your mind, you never raised
5  the fact that the lawsuit had been filed is one of
6  the reasons that it stood out to you, correct?
7     A.    I don't know.  I don't know.  I don't
8  know.
9     Q.    Okay.  Well, she's taking down your
10  testimony of everything that you said here.  And
11  you understand that you're under oath here today,
12  correct?
13     A.    Yes, I understand that.
14     Q.    And that you have agreed by being under
15  oath to tell the truth --
16     A.    Yes.
17     Q.    -- in response to my questions, correct?
18     A.    Yes.
19     Q.    But you testified earlier that in fact
20  you were not notified of this sexual assault until
21  you were actually named in the lawsuit, correct?
22     A.    Yes.
23     Q.    And do you recall when it was that you
24  were served with this lawsuit?
25     A.    I don't recall the date that I was

Page 98

1  served, no.  Whatever, if you have, did I sign the
2  date on the day I was served?
3     Q.    Do you recall signing a document
4  acknowledging that you were served with the
5  complaint in this case?
6     A.    Yes.
7     Q.    And do you remember doing that on the
8  same day that you were notified?
9     A.    I don't recall if it was the same date
10  or not.
11     Q.    Is that around the same time?
12     A.    Yes.
13     Q.    So that same day plus or minus a day or
14  two, right?
15     A.    I don't remember who served me.  I think
16  -- I think Heidi Brown brought me the
17  documentation and had me sign something and gave
18  me the lawsuit.  But date-wise, I don't remember
19  what day it was.
20     Q.    Okay.  Well, that's okay.  I'm going to
21  show you here, what for the record I'll say is
22  docket number 18 in this case.  This is a waiver
23  of summons.  Do you recognize your handwriting
24  anywhere?
25     A.    Yes.  Over here.

Page 99

1     Q.    And is this your handwriting?  By
2  "this", I mean the handwritten name to the left?
3     A.    No.  It doesn't appear to be mine, or
4  right.
5     Q.    But everything on the right is your
6  handwriting, correct?
7     A.    Not the phone number.  I didn't write
8  that.
9     Q.    Okay.
10     A.    That is me -- I don't want to touch your
11  screen.  The little bitty top one, the signature.
12     Q.    Under the line for signature of the
13  attorney or unrepresented party, that's your
14  handwriting signing your name, correct?
15     A.    It appears to be.  But I don't --
16     Q.    And this was filed on November 12th,
17  2018.  So, it must have been completed at some
18  point before that, right?  Because it would have
19  had to come to us in the mail.  I can represent to
20  you that we received it in the US mail.
21        So, fair to say that you signed this
22  sometime in early November of 2018?
23     A.    Yes.
24     Q.    You don't have any personal recollection
25  of signing it at any other time, correct?

Page 100

1     A.    No.  I don't.  Other than -- no.
2     Q.    Okay.  So at that time, and the lawsuit
3  was the first time that you were notified that
4  Haley Heilman, the reason she didn't come to work
5  that Monday was because of a sexual assault?  That
6  the first time you learned about that was when you
7  were filed, you were made aware that you were
8  named as a defendant in this lawsuit, correct?
9     A.    Aware of all of the details of what had
10  happened.  When I came, I don't remember the
11  dates, but all I know is I was at work one day,
12  came back to work the following work day, and she
13  no longer worked for me.  And all I knew was there
14  was an issue with Haley Heilman and that she no
15  longer worked for me.  As far as I knew, that she
16  had been transferred to another facility.  As far
17  as the details, I learned it all from the lawsuit
18  of what happened, actually happened.
19     Q.    And --
20     A.    Is that what you were asking me?
21     Q.    That's exactly what I was asking you.
22  So you were notified of those allegations a little
23  over 18 months later?  And so it's your -- so with
24  that time frame in mind, it's your testimony that
25  despite 18 months already having passed before you

Page 101

1 even knew that this was a lawsuit that would make
2 it convenient to remember certain conversations,
3 that that triggering event is the reason that this
4 conversation 18 months earlier stood out in your
5 mind, is that your testimony?
6     **MS. BOYLE:** I'm going to object to
7 mischaracterization of testimony, but go ahead and
8 answer.
9     **A.   I don't know.  I'm just somewhat
10 confused on what you're actually asking me.  Are
11 you saying that the only reason I remember it is
12 because I read the lawsuit?  Is that what you're
13 asking me?**
14     Q.   You already gave that testimony.  So
15 what I'm trying to understand is Haley Heilman has
16 said that she reported to you that she was in fear
17 for her safety due to threats and abusive behavior
18 from Jennifer Fleming.  Now, you dispute that.
19     **A.   I dispute that.**
20     Q.   And you say instead that the only
21 conversation that occurred was a general
22 conversation about Haley's generalized frustration
23 about Ms. Fleming?
24     **A.   Her roommate.**
25     Q.   So it's your testimony she never even

Page 102

1 mentioned Jennifer Fleming's name, is that
2 correct?
3     **A.   I'm so confused on where we're going
4 with this now.**
5     Q.   Well, perhaps we need to back up then.
6     **A.   Because she came in with, yes, there was
7 conversation about Jennifer Fleming being the
8 roommate.  Me saying that I'm sorry sometimes you
9 have to have roommates that are loud and
10 obnoxious.  I thought we said that already.**
11     Q.   And you agree that during that
12 conversation Ms. Heilman mentioned Jennifer
13 Fleming by name, correct?
14     **A.   She mentioned -- I'm pretty sure there
15 was a mention of her name.**
16     Q.   But it's your testimony -- sorry, go
17 ahead?
18     **A.   I don't recall disputing that.  I know
19 who the person is, I just assumed that's who we were
20 talking about, we knew that because that's who the
21 lawsuit is about, is her.  So it was a
22 misunderstanding on my part, I guess.**
23     Q.   But again, we are here today because
24 Haley Heilman has alleged that she told you
25 directly about threats and a fear for her safety

Page 103

1 that she suffered from as a result from living
2 with Jennifer Fleming.
3     **A.   No.  She did not tell me that at all.**
4     Q.   I understand that you dispute that.  And
5 it's your testimony that in fact you have an
6 independent recollection of the only conversation
7 in which Ms. Fleming's name ever came up in the
8 context of Haley Heilman, right?
9     **A.   In the conversation in the beauty shop
10 where her and the other offenders were discussing
11 who her new roommate was, or cell mate.  However
12 she puts it or you put it.  Which would be
13 Fleming.**
14     Q.   And it's your testimony that you can not
15 only recall that conversation based on your
16 independent recollection, right?
17     **A.   Yes.**
18     Q.   But, that you in fact recall the exact
19 words that she used to describe the problems that
20 she was having with her cell mate, correct?
21     **A.   Yes.**
22     Q.   Okay.  And so my question for you is, I
23 can understand the reasons why Haley Heilman would
24 remember reporting the fear for her safety that
25 she felt in the hours before she was brutally

Page 104

1 assaulted by her cell mate.
2     **A.   I wasn't even at work those days, so she
3 could not have reported any of that to me.**
4     Q.   You were at work on the Friday before
5 that sexual assault, weren't you?
6     **A.   I don't know.  I'd have to look at my
7 time sheet and see if I worked that date because I
8 honestly don't know.  But she did not report
9 anything to me of that nature, 'cuz if she would
10 have, I would have documented it and reported it
11 to the proper security staff.**
12     Q.   Your time sheet is Exhibit 14.  Would
13 you take that and --
14     **A.   What would that date be?**
15     Q.   It would be February 3rd, I believe.
16     **A.   So, I guess I did work that day.
17 February 3rd.**
18     Q.   And I'll represent to you that that is a
19 Friday.  Let me just confirm that.  Yep.  I'll
20 represent to you that February 3rd, 2017, is a
21 Friday.  That would have been consistent with your
22 schedule.  Correct?
23     **A.   Yes.**
24     Q.   And so you agree that there is a factual
25 dispute between you and Ms. Heilman as to what she

Page 105

1  told you about Jennifer Fleming during the period
2  of time that she and Ms. Fleming shared a cell
3  together?
4    A.  Yes.
5    Q.  And you agree that if she had reported
6  to you what she says she did report to you, that
7  the lack of response on your end would be an
8  inappropriate action, correct?
9    A.  Right.  I would have reported, if she
10  would have reported anything other than what she
11  was complaining about in the beauty shop to the
12  other offender.
13    Q.  You agree that saying that you would
14  look into the matter on Monday would be an
15  inappropriate response?
16    A.  Yes.  I agree.  I did not say that.  Are
17  you sure that she -- I guess you can't answer
18  that, or I can't suggest that to you.
19    Q.  And it's your testimony that the only
20  reasons you have an independent recollection of
21  this conversation are because you don't get
22  involved in conversations between prisoners,
23  correct?
24    A.  Yes.  Usually I don't get involved with
25  their conversations, yes.

Page 106

1    Q.  But that's the reason, the fact that you
2  interjected a comment into that conversation, is
3  one of the reasons this conversation stood out to
4  you in your independent recollection?
5    A.  Yes.
6    Q.  Now more than two years later, right?
7    A.  Yes.  I just recall that continuing
8  conversation amongst the offender and I remember
9  saying that to her.  Or saying that to the
10  offender.
11    Q.  Okay.
12    A.  In the shop.
13    Q.  Can you remember anything else that you
14  did during that day?
15    A.  Signed in inmates.  Tool reports.
16    Q.  How many inmates did you sign in on that
17  day?
18      MS BOYLE: Object to speculation.
19    A.  I'm going to guess 20 to 22 different
20  offenders in and out.  Tool reports.
21    Q.  Do you actually have an independent
22  recollection of signing inmates in and out on the
23  day that you had this conversation with Ms.
24  Heilman?
25    A.  If I worked that day, that's what I done

Page 107

1  because that is what I do on my work days.  Now as
2  far as which offender, no, I can not recall that.
3    Q.  Well, but again, earlier in the
4  deposition I gave you testimony about the
5  independent recollection.  And the difference
6  between that and the assumption that you might
7  make or something you would rely on a document to
8  say happened, right?  So one way you might think
9  something happened is because every day I do this,
10  every day I wake up, I stretch my arms, so I know
11  if it was a day I woke up, I stretched my arms.
12  That is different than having an independent
13  recollection in my mind of actually stretching my
14  arms on a given day.  Do you understand the
15  difference as I use those phrases?
16    A.  Yes.
17    Q.  Do you have an independent recollection
18  of any other activity that you took --
19    A.  No.
20    Q.  -- on the day that this conversation
21  occurred?
22    A.  No, nothing more than a repetitive day,
23  what I do every single day.
24    Q.  You testified that if you didn't report
25  you would be subject to discipline.  Do you recall

Page 108

1  giving that testimony?
2    A.  Yes.  'Cuz that's usually if we do not
3  report, we can be disciplined.
4    Q.  Tell me when in your tenure with the
5  IDOC you have ever known anyone to be
6  disciplined for failing to report?
7    A.  I don't know any particulars.  I just
8  know that we can be if we don't report something
9  of a serious nature.
10    Q.  Have you ever known anyone to be
11  disciplined for failing to report a report of
12  sexual misconduct?
13    A.  No.
14    Q.  Have you ever known anyone to be
15  disciplined for failing to report any other type
16  of required reportable?
17    A.  No.
18    Q.  So, I don't have anything else.
19    A.  Okay.
20      MS. BOYLE: I don't have any other
21  questions either.
22      THE WITNESS: I'll waive signature.
23      MS. GRADY: If it's okay with you, I
24  will just keep the exhibits that we will use
25  tomorrow.

Page 109

1           (The time is 3:46 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 110

1   STATE OF ILLINOIS    )
                          )   SS
2   COUNTY OF CHAMPAIGN   )

3           I, DEANN K. PARKINSON, a Notary Public
    in and for the County of Champaign State of
4   Illinois, do hereby certify that ANNETTE VEECH,
    the deponent herein, was by me first duly sworn to
5   tell the truth, the whole truth and nothing but
    the truth in the aforementioned cause of action.
6           That the foregoing deposition was taken
    on behalf of the Plaintiff on August 19, 2019.
7           That said deposition was taken down in
    stenographic notes and afterwards reduced to
8   typewriting under my instruction and said
    transcription is a true record of the testimony
9   given; and that it was agreed by and between the
    witness and attorneys that said signature on said
10  deposition would be waived.
            I do hereby certify that I am a
11  disinterested person in this cause of action; that
    I am not a relative of any party or any attorney
12  of record in this cause, or an attorney for any
    party herein, or otherwise interested in the event
13  of this action, and am not in the employ of the
    attorneys for either party.
14          In witness whereof, I have hereunto set
    my hand and affixed my notarial seal October 21,
15  2019.

16  _____

17                      DEANN K. PARKINSON, CSR
                        NOTARY PUBLIC
18

19

20

21

22

23

24

25