### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HALEY HEILMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3260 |
| | ) | |
| MARGARET BURKE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge.**

Plaintiff Haley Heilman is a former resident of the Logan
Correctional Center, a facility operated by the Illinois Department of
Corrections (IDOC).  In February 2017, Ms. Heilman was raped by
her cellmate.  After her release, Ms. Heilman sued nineteen IDOC
officials and employees pursuant to 42 U.S.C. § 1983.  Ms. Heilman
alleges that these Defendants violated the Eighth Amendment and
Illinois law by failing to protect her from her assailant.

This matter comes before the Court on Defendants' motion for
summary judgment.  See Defs.' Mot. Summ. J., d/e 103.  For the
reasons that follow, the motion is GRANTED IN PART and DENIED
IN PART.

# I. BACKGROUND

## A.   Parties

Plaintiff Haley Heilman is a former resident of the Logan Correctional Center.  Ms. Heilman entered Logan in the fall of 2016 and remained there until February 2017, when she was transferred to another facility.  She completed her sentence in February 2018.

Defendant Maggie Burke was Logan's chief administrative officer, or warden, at all relevant times.  Warden Burke was responsible for overseeing day-to-day operations at Logan, including compliance with the Prison Rape Elimination Act (PREA); for promulgating rules, regulations, policies, and procedures to ensure the safety of the women housed at Logan; and for supervising, training, assigning, and disciplining Logan's counselors, correctional officers, internal-affairs investigators, and other staff.

Defendant Beatrice Calhoun was the Assistant Warden of Operations at Logan at all relevant times.  Ms. Calhoun was responsible for implementing and overseeing Logan's policies and practices regarding housing, placement, and security.

Defendant Angel Wilson was Logan's Assistant Warden of Programs at all relevant times.  Like Ms. Calhoun, Ms. Wilson

implemented and oversaw certain policies and practices at Logan,
including Logan's mental-health, educational, and religious
programming.  Ms. Wilson also served as Logan's PREA compliance
manager at all relevant times.  In that capacity, Ms. Wilson was
responsible for ensuring compliance with PREA regulations and
standards and for developing, planning, and overseeing efforts to
address the problem of custodial sexual assault at Logan.

Defendants Aadam Cox,[1] Justin Gannon, Chase Goleash,
Kelby Jasmon, Brandon Lounsberry, Christopher Lynch, and Legna
Velasquez were correctional officers or supervisory correctional
officers at Logan at all relevant times.  Officers Goleash, Jasmon,
Lynch, and Velasquez were assigned to the dayshift in Ms.
Heilman's housing unit in the months before her assault and
worked under the supervision of Sgt. Gannon.  Officers Cox and
Lounsberry were assigned to the nightshift in Ms. Heilman's
housing unit and were on patrol when Ms. Heilman was assaulted.

Defendants Guy Carter, Greg DeJarnette, and Troy Singleton
worked in Logan's Reception & Classification Center at all relevant

---

[1] The Court spells Officer Cox's first name as he does.  See A. Cox
Dep., d/e 113-46, at 7:5 ("A: Aadam Cox; A-A-D-A-M, C-O-X.").

times.  Mr. DeJarnette and Mr. Carter served as correctional counselors and were tasked with administering intake evaluations. Their immediate superior was Mr. Singleton, the center's casework supervisor.  Among other things, these Defendants were responsible for performing PREA-mandated screenings and evaluations.

Defendants Todd Sexton and Nicole Price[2] were assigned to Logan's internal-affairs unit at all relevant times.  Maj. Sexton bore principal responsibility for investigating allegations of staff and prisoner misconduct at Logan.  Officer Price worked under Maj. Sexton's supervision and at his direction.

Defendant Annette Veech was a Logan employee assigned to the facility's beauty shop at all relevant times.  Ms. Heilman worked in the beauty shop under Ms. Veech's supervision in the months before her assault.

Defendants Rachelle Aiken, Josh Edwards, and Jacob Gerringer worked in Logan's placement office at all relevant times.

---

[2] Ms. Heilman sued Nicole Price under her former name, Nicole Veech.  Because the parties now refer to her as Nicole Price, see Pl.'s Resp., d/e 116, at 34 n.3, the Court does the same.

These Defendants selected housing units for and assigned cellmates to prisoners at Logan, including Ms. Heilman and Jennifer Fleming.

## B.    Facts

The Court draws these facts from the parties' statements of undisputed facts and the evidence they submitted.  The Court deems admitted those facts not in dispute or disputed without an evidentiary basis.  See L.R. 7.1(D)(2)(b)(2).

### 1. Logan Correctional Center.

Logan Correctional Center is a mixed-security women's prison located in Lincoln, Illinois.  Logan opened in 1978 as a men's facility.  By the early 1990s, IDOC had converted Logan into a mixed-gender facility.  Logan reverted to its prior male-only status a few years later.

In early 2013, IDOC consolidated "the populations of the state's two largest women's prisons" and transferred them to Logan. See Pl.'s Resp. ex. 2, d/e 113-2, at 15 ("GIPA Report").  Before the transition, Logan had around 1,500 medium-security male prisoners.  Afterward, Logan was responsible for a custodial "population of 2,000 (or more) women across all security classifications," in addition to serving as the statewide Reception &

Classification center for each of the 2,500 or so women sentenced to IDOC custody every year.  Id.  As the John Howard Association of Illinois, a nonprofit prison-monitoring organization, would later report, the Logan conversion was "under[-]resourced and ill-conceived."  Id.  An IDOC-led study similarly found that the transition "took place with limited planning, staff training[,] and efforts to take into account the unique nature and needs of such a large, complex women's prison population."  Id.

In March 2015, while serving as head of IDOC's Women & Family Services Unit, Defendant Margaret Burke commissioned a gender-informed practice assessment (GIPA) at Logan.  See id. at 7. This study sought to evaluate "Logan's ability to respond to the needs of [its] unique population"—that is, incarcerated women—and to devise and propose "evidence-based" and "trauma-informed" improvements.  M. Burke Dep., d/e 113-7, at 55:20–56:1.  The GIPA team surveyed nearly 1,000 Logan prisoners, staff members, and external stakeholders.

Among other things, the study concluded that Logan's "divisive facility culture" had engendered an "unstable environment that undermines the safety of both the women [prisoners] and

staff." GIPA Report, d/e 113-2, at 18. For instance, although women of color predominated in Logan's custodial population, the facility was managed "by a predominantly white and male staff" with "little, if any, training on cultural responsivity." Id. at 21. Staff members, too, "voiced concerns about being unprepared to work with the Logan population, where 770 women are identified as SMI [seriously mentally ill], 60% are estimated to be suffering from PTSD, and 75% have been the victims of sexual abuse." Id. at 20. Logan's incarcerated population echoed this assessment. Of the 800 prisoners surveyed, 84.4% indicated that Logan staff failed to treat the women in their custody with respect.

The study also identified systemic deficiencies in Logan's handling of grievances—written requests or complaints submitted by prisoners. The GIPA team concluded that Logan's grievance process "[p]revent[ed] management from [k]nowing about and [c]orrecting [p]roblems." Id. at 18. The team's findings revealed that grievances were "not being properly tracked, logged, and returned back to the grievance officer or the warden in a timely manner and according to departmental policy." Id. at 18–19. The team further found that some Logan staff members "intimidate

women and throw grievances out or dismiss them prematurely." Id. at 19.  Other Logan employees, the team concluded, outright retaliated against prisoners for filing grievances against them; women at Logan reported "losing their job assignments, being arbitrarily moved, [and otherwise] being mistreated by staff" for complaining about staff misconduct.  Id.  And still other staff and supervisors deterred prisoners from filing grievances by telling them that their complaints or allegations would "not be believed."  Id.

### 2. Haley Heilman's Incarceration Before January 11, 2017.

In September 2016, Plaintiff Haley Heilman pleaded guilty in Illinois state court to burglary and drug possession.  The circuit court sentenced Ms. Heilman to four years' incarceration, to be served with day-for-day credit, in the Illinois Department of Corrections.  Ms. Heilman then was remanded to IDOC custody and transported to Logan for intake.  When Ms. Heilman received her sentence, she was 22 years old, stood a little over five feet tall, and weighed 130 pounds.  See Pl.'s Resp. ex. 38, d/e 114-9, at 2.

Ms. Heilman arrived at Logan for Reception & Classification on September 30.  Among other assessments and examinations, Ms. Heilman was screened by Defendant Greg DeJarnette, then one of

Logan's correctional counselors, for her risk of sexual victimization ("vulnerability risk") and abusiveness ("predatory risk").  See Defs.' Reply, d/e 120, at 2.  The screening, according to IDOC, "is designed to assist in designation of vulnerability and/or predator status" and to inform "housing, bed, work, education, and program assignment[s]."  Pl.'s Resp. ex. 3, d/e 113-3, at 57 (form entitled "Screening for Potential Sexual Victimization or Sexual Abuse").  Under IDOC policy, correctional counselors must complete the screening by consulting all available records, including the prisoner's IDOC disciplinary history and master file.  However, Logan's counselors relied solely on prisoners' self-reporting.

IDOC's vulnerability-risk screening consists of thirteen questions.  An answer most indicative of possible vulnerability adds two points; an answer moderately indicative of vulnerability adds one point; and an answer not indicative of vulnerability adds zero points.  The sum of these points determines the prisoner's place on a "vulnerability continuum"—the more points the prisoner accrues in answering these questions, the more presumably susceptible the prisoner is to sexual abuse.  Mr. DeJarnette scored Ms. Heilman at an 8, placing her at the "Likely" end of the vulnerability continuum.

IDOC's predatory-risk screening proceeds similarly.  Each of the screening's five questions has two possible answers, with a responsive answer incurring two points and a non-responsive answer incurring no points.  When Ms. Heilman entered Logan, IDOC's predatory-risk assessment asked whether the prisoner had (1) a history of institutional sexually abusive behavior, (2) a criminal history of similar behavior in the community, (3) a criminal history of domestic violence, (4) a heightened custodial security classification, or (5) a history of institutional assaultive or violent behavior.  Under IDOC policy, if a prisoner receives more than seven predatory-risk points, she must be referred to her facility's PREA officials for further assessment.  Mr. DeJarnette assessed Ms. Heilman zero predatory-risk points, classified Ms. Heilman as "minimum-security," and calculated her aggression level as "low."

On November 1, after completing her Reception & Classification process, Ms. Heilman was moved to Housing Unit 5. A series of short-term moves followed.  Eventually, Ms. Heilman was assigned a room in Housing Unit 8, a low-security, dorm-style unit. She and her two roommates, Terri Gibbons and Yvonne Williams, occupied three of the room's four bunk beds.

### 3. Jennifer Fleming's Incarceration Before January 11, 2017.

In September 2016, Jennifer Fleming was convicted in Illinois state court of armed robbery and sentenced to 30 years' incarceration. At the time of her arrest, Ms. Fleming had just begun a term of mandatory supervised release on a 2012 armed-robbery conviction. Ms. Fleming previously had been convicted of armed robbery (in 2007) and of robbery (in 2002). Before her 2016 conviction, Ms. Fleming had been in IDOC custody three times: from November 2002 to September 2005, from May 2008 to July 2010, and from April 2011 to April 2016.

Ms. Fleming was transferred from the Cook County Jail to Logan Reception and  on September 21, 2016. Shortly thereafter, Defendant Guy Carter performed Ms. Fleming's intake and classification interview, which included her mandatory screening for risk of sexual abusiveness. Although Ms. Fleming had a lengthy IDOC record, Mr. Carter's screening largely relied on Ms. Fleming's own reporting. Mr. Carter later testified that while he "had access to" Ms. Fleming's "disciplinary tracking at the time she came in," he could not recall reviewing any of it. G. Carter Dep., d/e 113-17, at

60:11–13.  Mr. Carter "declined to indicate" on his PREA screening documentation "that Ms. Fleming had a history of institutional sexual abuse," despite a disciplinary history that included charges of sexual misconduct against staff.  Id. at 83:8–14.   Mr. Carter made the same decision on Ms. Fleming's "history of institutional assaultive and violent behavior," despite her lengthy history of assaulting staff and prisoners.  Id. at 83:18–86:19; see also id. at 86:20–23 ("Q: As you sit here today, you are not aware of any justification for answering the question in the negative, correct?  A: Correct.").  Mr. Carter ultimately assigned Ms. Fleming a "0 on all five predatory factors."  Defs.' Reply, d/e 120, at 9–11.

Defendant Troy Singleton, Mr. Carter's supervisor, reviewed Mr. Carter's classification documents before their submission.  Like Mr. Carter, Mr. Singleton's practice "was to rely on the prisoner's self-report about her disciplinary history, gang affiliation, and criminal history" in finalizing a classification decision.  Id. at 13–14.  Mr. Singleton "did not correct any portion of the screening instrument reflecting Fleming's . . . risk of sexual abusiveness."  Id. at 14.  Instead, he concurred with Mr. Carter's determination that Ms. Fleming was "not likely" a predator.  Id. at 14.

Ms. Fleming built up a considerable disciplinary record during her first three terms in IDOC.  Over the course of more than ten years—and more than 240 disciplinary hearings—Ms. Fleming was found guilty of 398 disciplinary infractions.  These infractions included three instances of "assaulting another person," seven instances of "intimidation or threats," and eight instances of "fighting with another prisoner."  <u>See</u> Defs.' Reply, d/e 120, at 10; <u>see also</u> Pl.'s Resp. ex. 28, d/e 113-28 (Fleming disciplinary card as of Jan. 3, 2019).  Ms. Fleming further incurred several substantiated charges of attempted escape, theft, disobeying direct orders, and disruptive behavior.  During her first three incarcerations, IDOC's mental-health staff diagnosed Ms. Fleming with a host of psychological conditions, including bipolar, antisocial-personality, and impulse-control disorders.  Dr. Norine Ashley, then Logan's PREA compliance manager, later testified that Ms. Fleming's disciplinary history and psychological diagnoses warranted her designation as a predator.

Ms. Fleming's record also contained several charges of sexual misconduct.[3]  In December 2008, Ms. Fleming "exposed her genitalia" to an IDOC physician's assistant "and mimicked masturbation while making lewd comments about the physician's assistant's genitalia."  Defs.' Reply, d/e 120, at 10–11.  When the physician's assistant asked Ms. Fleming to "cover up," Ms. Fleming instead "exposed her breasts and solicited the physician's assistant for sex."  Id.  A disciplinary committee found Ms. Fleming guilty of sexual misconduct and insolence, relegated her to "C-grade" status for one year, and required her to spend three months in "disciplinary segregation," or solitary confinement.  Pl.'s Resp ex. 28, d/e 113-28, at 6.  In 2012, Ms. Fleming again was charged with sexual misconduct and insolence, this time for "dropp[ing her] pants."  Id. at 15.  A disciplinary committee declined to sustain the sexual-misconduct charge but found Ms. Fleming guilty of insolence, sentencing her to 15 days in disciplinary segregation.

---

[3] IDOC's internal regulations define the disciplinary offense of "sexual misconduct" as "engaging in sexual intercourse, sexual conduct, or gesturing, fondling, or touching done to sexually arouse, intimidate, or harass either or both" the perpetrator and the victim.  See Defs.' Reply, d/e 120, at 4–5.

Under IDOC policy, both of Ms. Fleming's sexual-misconduct allegations required an automatic referral for a determination of predatory likelihood. Nevertheless, no such referral was made.

After being admitted to general population in October 2016, Ms. Fleming received five disciplinary citations during her first few weeks at Logan. On October 2, Ms. Fleming incurred a verbal reprimand for calling a staff member "bitch-ass" and "faggot-ass" and telling him to "fuck off." Id. at 16. On October 12, Ms. Fleming was issued another disciplinary ticket for declining to follow a female correctional officer's order to return to her cell. Ms. Fleming had responded to the officer by "grabbing [Ms. Fleming's] crotch, swinging her hand[,] and cocking her head side to side," before asking, "Man, what you gon' do?" Id. at 16–17. Noting that Ms. Fleming "continuously exhibits this behavior toward" other prisoners and staff, a Logan disciplinary committee found Ms. Fleming guilty of insolence and disobeying a direct order. Pl.'s Resp. ex. 61, d/e 114-12. And on November 12, a female prisoner reported to a correctional officer that Ms. Fleming had assaulted her. Ms. Fleming was assessed 15 days in disciplinary segregation and a month's worth of privilege restrictions for fighting another

inmate.  None of these incidents led Logan to revise Ms. Fleming's security, aggression, or predatory-risk statuses.  As of January 11, 2017, Ms. Fleming remained classified as a medium-security and low-aggression prisoner.

### 4. Closure of D-Wing.

In January 2017, Warden Burke decided to close and repurpose a section of Logan's Housing Unit 15 known as the "D-Wing."  D-Wing, which adjoined both Logan's Receiving & Classification  center and its disciplinary-segregation unit, housed the facility's maximum-security population.  Prisoners in D-Wing essentially lived under conditions of solitary confinement.  As Warden Burke later testified, D-Wing "had morphed into a second segregation" unit, where prisoners were "locked in their rooms for the majority of the day, rather than being allowed out and attending programming."  M. Burke Dep., d/e 113-5, at 54:3–12.  Warden Burke sought to integrate D-Wing's residents into the general population.  The move also was intended to free up additional space for Housing Unit 15's other residents.

A number of staff members and stakeholders cautioned Warden Burke against closing D-Wing.  They included Defendant

Beatrice Calhoun, Logan's Assistant Warden of Operations, who believed that "the sudden transition of D[-]Wing prisoners with a history of disciplinary and behavioral issues . . . posed substantial safety risks for prisoners" in Logan's general population.  Defs.' Reply, d/e 120, at 20.  Ms. Calhoun was particularly concerned that D-Wing residents "would pose a heightened risk of assault to women . . . who did not have a history of disciplinary and behavioral issues, and who would be housed with or near them as a result" of D-Wing's closure.  Id.  Ms. Calhoun raised these concerns to Warden Burke "on multiple occasions," but to no avail.  Id.  Defendants Todd Sexton and Nicole Price, Logan's two-person Internal Affairs team, shared Ms. Calhoun's reservations.  They advised Warden Burke "that the movement of prisoners" from D-Wing to less restrictive housing units "would pose a safety risk to the women living in those units."  Id. at 20–21.  Similarly, Sergeant Shaun Dawson—then president of Logan's AFSCME local chapter— brought his members' concerns directly to Warden Burke.  Indeed, "correctional staff throughout Logan," including "correctional officers, sergeants, lieutenants, and even shift commanders," were vocally opposed to D-Wing's closure.  Id.

Warden Burke later admitted to her awareness of her plan's riskiness.  She knew that "moving offenders who had been kept in their rooms for 20-plus hours a day . . . to a different housing unit" posed an inherent safety hazard.  Id. at 21.  She also knew that Logan prisoners were at an especially acute risk of sexual violence and misconduct, given that the prison had "more PREA complaints than other facilities within the IDOC on a typical annual basis."  M. Burke Dep., d/e 113-5, at 130:15–23; see also A. Wilson Dep., d/e 113-6, at 51:15–22 (testifying that Logan "had hundreds of PREA allegations" between June 2016 and June 2018).

Warden Burke also testified to taking several steps to address her subordinates' concerns: installing an additional correctional officer on each wing, increasing the frequency of "supervisory rounds," and instilling an "expectation that everyone be more mindful of the unit itself and to try to put out fires before they start."  M. Burke Dep., d/e 113-5, at 77:7–78:23.  But Warden Burke's codefendants could not corroborate her testimony.  In Defendant Justin Gannon's recollection, D-Wing's closure came "overnight" and left correctional officers "shocked."  See J. Gannon Dep., d/e 113-7, at 38:1–24.  Contemporaneous IDOC records show

"that no staffing modifications" were made in the months following D-Wing's closure.  Defs.' Reply, d/e 120, at 21–22.  Regardless, on January 11, 2017, Warden Burke ordered her staff to begin reassigning D-Wing's prisoners to other units.

Later that day, Ms. Fleming became one of the first two D-Wing residents to receive a new housing assignment, when Defendant Joshua Edwards assigned Ms. Fleming to Ms. Heilman's room in Housing Unit 8.  As the sole employee in Logan's placement office, Officer Edwards had "free reign" in making room-assignment decisions.  Id. at 24.  Officer Edwards "was familiar with Fleming and her penchant for disciplinary infractions."  Id.  "[W]hen placing prisoners, [Officer Edwards] had access to all classification information of the women in the cells he was considering placing a prisoner into," including that of Ms. Fleming, Ms. Heilman, and their roommates.

Ms. Heilman soon received word that Ms. Fleming would be moving into Ms. Heilman's cell.  Ms. Heilman knew Ms. Fleming by name and reputation, and she knew that Ms. Fleming had recently spent several weeks in segregation for biting another woman.  Ms. Heilman's roommates, Terri Gibbons and Yvonne Williams, shared

Ms. Heilman's reservations.  The three women promptly asked

Defendant Christopher Lynch, one of the correctional officers

assigned to Housing Unit 8, why Ms. Fleming had been assigned to

their room.  "Because that's where the warden put her," Officer

Lynch responded.  Defs.' Reply, d/e 120, at 25.  Later that day, Ms.

Heilman shared her concerns about her new roommate with

Defendant Annette Veech, Ms. Heilman's supervisor in Logan's

beauty shop.  Ms. Veech told Ms. Heilman that she was "so sorry,"

and instructed Ms. Heilman to let her know "if there's anything [she

could] do to help."  Id.

### 5. Events Preceding Ms. Heilman's Assault.

Ms. Fleming moved into Ms. Heilman's cell on January 17,

2017.  Within a few days, Ms. Fleming began to subject Ms.

Heilman to near-constant sexual harassment.  Ms. Fleming would

demand that Ms. Heilman "get [her] ass back in the room" whenever

she dared to leave, tell Ms. Heilman that she "owned [Ms.

Heilman's] pussy" and that Ms. Heilman's "pussy was [hers]," and

scream other obscenities at Ms. Heilman in the common areas of

their housing unit.  Id. at 25–26.  Ms. Fleming often commented

on—and habitually slapped—Ms. Heilman's buttocks.  On several occasions, Ms. Heilman caught Ms. Fleming watching her shower.

Ms. Heilman alleges that she and her roommates reported all this behavior to a host of Logan officers and employees, including Defendants Justin Gannon, Kelby Jasmon, Christopher Lynch, and Legna Velazquez.  These Defendants served as dayshift correctional officers in Ms. Heilman's housing unit.  IDOC policy required that any officer who received a report of sexual harassment or misconduct take several steps in response, including (1) documenting the report in writing, (2) notifying the officer's shift supervisor of the prisoner's allegations, and (3) separating the reporting prisoner from her alleged harasser.  Although Defendants Gannon, Jasmon, Lynch, and Velasquez dispute that they knew of Ms. Fleming's conduct, they undisputedly failed to address it.

Logan also provided its residents with other, more discreet means of reporting sexual misconduct and harassment.  Besides speaking directly to a correctional officer or employee, prisoners could report sexual misconduct by calling the facility's PREA hotline or by submitting a "request slip" to Internal Affairs.  See Pl.'s Resp. ex. 28, d/e 113-28, at 25 (IDOC resident-handbook section entitled

"How to report sexual abuse").  Ms. Heilman "submitted two request slips to Internal Affairs on approximately January 21 and January 28[, 2017,] reporting that Fleming had moved into [Ms. Heilman's] room and was sexually harassing her."  Defs.' Reply, d/e 120, at 30.  "Around the same time," Ms. Gibbons and Ms. Williams "each submitted a request slip . . . reporting that [Ms. Heilman] was being sexually harassed by Fleming as well."  Id.  All three women submitted their complaints "by placing them inside a locked box in Housing Unit 8 near the officer's desk that is designated for request slips."  Id.  As several Logan employees testified, request slips ordinarily were collected the day they were submitted and "hand[ed] over" to Defendants Todd Sexton and Nicole Price, Logan's two internal-affairs officers, the next day.  Id. at 31–32.  Maj. Sexton later testified that "he was not aware of any issues with proper and timely delivery of request slips through the institutional mail system."  Id. at 31.  Still, neither Ms. Heilman nor her roommates "received any responses to their request slips," and neither Maj. Sexton nor Officer Price "took any action in response."  Id. at 32.

Logan received similar reports from outside its walls.  Wendy Earhart, Ms. Heilman's mother, phoned the facility several times to

warn that Ms. Fleming posed a risk to her daughter's safety.[4]

Defendant Angel Wilson, the facility's Assistant Warden of

Programs, received at least one of those calls.  A few days after

speaking with Ms. Earhart, Ms. Wilson "happened to see [Ms.

Heilman] walking outside on the grounds as Wilson was walking to

the health care unit."  Id. at 34.  "While on the walkway in the

middle of the institution—in an outdoor setting with no privacy—

Wilson told [Ms. Heilman] that her mother had called and asked

[Ms. Heilman] 'if everything was okay in her room[.]'"  Id.  Ms.

Heilman "told her it was fine."  Id.  At some point,[5] Ms. Wilson told

Defendant Beatrice Calhoun, then Logan's Assistant Warden of

Operations, of Ms. Earhart's phone call.  Neither woman took any

further action.

---

[4] In a sworn statement, Ms. Earhart attested that she "express[ed] concern over Jennifer Fleming, her threatening behavior toward Haley [Heilman], and Haley [Heilman's] safety and housing placement."  Earhart Aff. ¶ 3, d/e 113-67.  Ms. Earhart further attested to placing three or four such calls.  Id. ¶ 5.

[5] Ms. Wilson and Ms. Calhoun offered materially different timelines. See infra Part IV.A.8; Part IV.A.9.  Ms. Wilson testified that she spoke with Ms. Calhoun before Ms. Heilman's assault.  Conversely, Ms. Calhoun said that she did not learn of the call until after Ms. Heilman's assault, during Logan's PREA-mandated investigation.

Around the same time, Defendant Annette Veech, Ms. Heilman's beauty-shop supervisor, called Defendant Justin Gannon to report that Ms. Heilman felt unsafe in her placement with Ms. Fleming.  It was the first and only such call that Ms. Veech made in her 25-year IDOC career.  Sgt. Gannon then relayed this information to his immediate supervisor, the housing unit's zone lieutenant, and "identif[ied] [Ms. Heilman] by name" as the reporting prisoner.  Id. at 29.  The lieutenant told Sgt. Gannon that Ms. Heilman "can either refuse" her housing placement, thereby committing a disciplinary infraction, "or stay with that."  Id.  Sgt. Gannon "did not take any further action to respond to the information that he had learned from Veech, including talking to [Ms. Heilman] or anyone else."  Id.

On February 2, Ms. Heilman and Ashley Underwood, another Logan prisoner, sought help from Defendant Kelby Jasmon, one of the line correctional officers assigned to their housing unit.  Ms. Underwood asked Officer Jasmon how he would handle a hypothetical case of inter-prisoner sexual harassment.  Officer Jasmon responded by gesturing to his face and stating, "Let me guess, Fleming."  Id. at 35–36.  After Ms. Underwood confirmed

Officer Jasmon's suspicion, Officer Jasmon suggested that the best response to Ms. Fleming's behavior would be to "beat her ass."  Id.

### 6. Ms. Heilman's Assault; Aftermath.

On the night of February 4, 2017, Ms. Heilman was resting in her bed—atop the two-person bunk she shared with Ms. Fleming—when Ms. Fleming entered the cell.  Ms. Fleming began verbally harassing Ms. Heilman.  Eventually, she mounted the bed and stuck her tongue in Ms. Heilman's mouth.  Ms. Fleming left their room soon after, while Ms. Heilman remained.  A few hours later, Ms. Fleming returned to the cell and found Ms. Heilman and Ms. Gibbons watching an episode of Saturday Night Live.  Ms. Fleming asked Ms. Heilman to give her food, but Ms. Heilman declined. Once the show ended, Ms. Gibbons headed to bed.

At 12:58 a.m. that evening, Defendant Brandon Lounsberry reached the midpoint of his "check" of Ms. Heilman's wing in Housing Unit 8.  As a nightshift correctional officer, Officer Lounsberry was required to walk from one end of the wing to the other, searching for aural or visual signs of improper activity, at half-hour increments.  Once he reached the end of the wing, Officer Lounsberry was required to sign a "wing check logbook," thereby

confirming that he had completed his duties, before returning to the other side.

At approximately 1:00 a.m., Ms. Fleming again demanded that Ms. Heilman give her a snack.  Ms. Heilman finally relented and walked over to her property box to retrieve a granola bar.  Ms. Fleming then grabbed Ms. Heilman and forced her onto the lower bed of their shared bunk.  Ms. Fleming put one hand over Ms. Heilman's mouth and the other around her neck, pushed one of her legs into Ms. Heilman's groin, and bit Ms. Heilman's shoulder.  Ms. Fleming proceeded to rape Ms. Heilman with a makeshift dildo.  The attack lasted about ten minutes.  Afterward, Ms. Fleming told Ms. Heilman not to report the assault to anyone.  If Ms. Heilman did, Ms. Fleming warned, Ms. Fleming would take Ms. Heilman with her to disciplinary segregation.

By 1:28 a.m., Defendant Aadam Cox had relieved Officer Lounsberry and conducted another wing check.  Both officers recalled seeing and hearing nothing awry in Ms. Heilman's darkened room, although both officers also testified that they were prohibited from shining a flashlight inside it.

The following morning, Ms. Heilman told Ashley Underwood, another Logan prisoner, that she had been raped. Ms. Underwood then reported the assault to Defendant Legna Velasquez, who initiated the facility's PREA-mandated protocols. Ms. Heilman then was taken to a hospital in nearby Decatur. The examination revealed bite marks and bruises on Ms. Heilman's neck, shoulders, and back, as well as tears and abrasions in and around Ms. Heilman's vagina. A further pelvic examination found damaged tissue hanging from Ms. Heilman's vaginal wall; the tissue later required surgical removal. Ms. Heilman experienced significant genital pain and burning for several days. She continues to suffer nightmares, anxiety, and depression stemming from her later-diagnosed post-traumatic stress disorder.

IDOC's statewide internal-affairs department began an immediate investigation into Ms. Heilman's assault. In early March, IDOC's investigators determined that Ms. Fleming had indeed committed sexual assault and aggravated criminal sexual assault against Ms. Heilman. Ms. Fleming ultimately received a one-year term in solitary confinement, among other sanctions. Around the same time, Logan's PREA review committee designated Ms. Fleming

as a "predator," reversing Mr. Carter and Mr. Singleton's contrary determination.  The committee's report cited Ms. Fleming's history of staff and inmate assaults, fighting, and sexual misconduct.

## C.  Procedural History

In October 2018, shortly after leaving IDOC custody, Ms. Heilman brought this suit pursuant to 42 U.S.C. § 1983.  Compl., d/e 1.  She amended her complaint in August 2019.  Am. Compl., d/e 48.  After the close of discovery, Defendants moved for summary judgment.  Defs.' Mot. Summ J., d/e 103.  Defendants also moved to exclude the report of Cameron Lindsay, a former federal correctional official and Ms. Heilman's corrections expert, and to bar him from testifying at trial.  Defs.' Mot., d/e 121.  The Court later denied that motion in a written order.  Order, d/e 128.

## II. JURISDICTION AND VENUE

Ms. Heilman brought this action pursuant to 42 U.S.C. § 1983.  This Court, therefore, has federal-question jurisdiction over her claims.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The Court also has supplemental jurisdiction over Ms. Heilman's state-law

claims, which share a common nucleus of operative fact with her federal claims.  <u>See</u> 28 U.S.C. § 1367 (district courts have jurisdiction "over all other claims that are so related to claims . . . within such original jurisdiction that they form part of the same case or controversy").  Venue is proper because "a substantial part of the events or omissions giving rise" to Ms. Heilman's claims occurred within this District.  <u>See</u> 28 U.S.C. § 1391(b).

### III. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the lack of any genuine dispute of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A genuine dispute of material fact exists if a reasonable trier of fact could find for the nonmoving party.  <u>Carroll v. Lynch</u>, 698 F.3d 561, 564 (7th Cir. 2012).  At summary judgment, the Court construes all facts in the light most favorable to the non-moving party and draws all

reasonable inferences in that party's favor.  <u>Woodruff v. Mason</u>, 542
F.3d 545, 550 (7th Cir. 2008).

## IV. DISCUSSION

Ms. Heilman brings three claims here.  In Count I, Ms.
Heilman charges that, by failing to mitigate a known risk of harm—
that of being assaulted by her cellmate, Jennifer Fleming—or to
mitigate a generally heightened risk of sexual violence at Logan,
Defendants were deliberately indifferent to Ms. Heilman's Eighth
Amendment rights.  In Count II, Ms. Heilman alleges that Warden
Burke and Assistant Wardens Calhoun and Wilson failed to provide
their staff with adequate training and supervision, again in violation
of the Eighth Amendment.  In Count III, Ms. Heilman claims that
Defendants' federal constitutional liability translates into state-law
tort liability for willful and wanton conduct.

Defendants seek summary judgment on all three counts.
Defendants claim that they are entitled to qualified immunity from
Count I, Eleventh Amendment sovereign immunity from Count II,
and state-law sovereign immunity from Count III.  On the merits,
Defendants contend that Ms. Heilman "cannot establish the
requisite involvement for personal liability for many of the named

Defendants."  Defs.' Mot. Summ. J., d/e 103, at 2.  As for those

with "actual involvement" in the events surrounding Ms. Heilman's

assault, Defendants say that "the actions attributed to them do not

get close to that required for" Eighth Amendment or willful-and-

wanton liability.  Id.

## A. Defendants' Motion for Summary Judgment on Count I is Granted in Part and Denied in Part.

Ms. Heilman's first count charges that Defendants were

deliberately indifferent to her Eighth Amendment rights by failing to

protect her from her assailant.  In prohibiting "cruel and unusual

punishment," the Eighth Amendment further requires that prison

officials "take reasonable measures to guarantee the safety" of the

prisoners in their care.  Farmer v. Brennan, 511 U.S. 825, 832

(1994) (citing Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).

Therefore, to survive Defendants' motion for summary judgment,

Ms. Heilman must establish that a reasonable factfinder could

conclude that Defendants were deliberately indifferent to "an

excessive risk to inmate health or safety."  Gevas v. McLaughlin,

798 F.3d 475, 480 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837).

A claim of deliberate indifference consists of two elements.
First, "the harm to which the prisoner was exposed must be an
objectively serious one." Gevas, 798 F.3d at 480. Second, the
official must have had "actual, and not merely constructive,
knowledge of the risk" of harm and disregarded that risk all the
same. Id. On this element, "the official must both be aware of facts
from which the inference could be drawn that a substantial risk of
serious harm exists, and he must also draw the inference." Farmer,
511 U.S. at 837. Although "this inquiry focuses on an official's
subjective knowledge, a prisoner need not present direct evidence of
the official's state of mind." Gevas, 897 F.3d at 480. Rather,
"[w]hether a prison official had the requisite knowledge of a
substantial risk is a question of fact subject to demonstration in the
usual ways, including inference from circumstantial evidence."
Farmer, 511 U.S. at 842.

A general risk of harm is not enough to establish the existence
of a "substantial risk." See Shields v. Dart, 664 F.3d 178, 181 (7th
Cir. 2011). Still, if a plaintiff presents evidence that a risk of
attacks was "longstanding, pervasive, well-documented, or
expressly noted by prison officials in the past, and the

circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it," then an inference of actual knowledge of a substantial risk of harm may be permissible.  <u>Farmer</u>, 511 U.S. at 843.  As the Seventh Circuit has noted, an official's actual knowledge of a substantial risk "can be inferred by the trier of fact from the obviousness of the risk."  <u>Haley v. Gross</u>, 86 F.3d 630, 641 (7th Cir. 1996) (citing <u>Farmer</u>, 511 U.S. at 842).

However, individual liability under section 1983 requires personal involvement in the constitutional deprivation.  <u>Gonzalez v. McHenry Cnty.</u>, 40 F.4th 824, 828 (7th Cir. 2022).  To establish personal liability under section 1983, a plaintiff must show that the official "caused the constitutional deprivation at issue or acquiesced in some demonstrable way in the alleged constitutional violation." <u>Id.</u>  "Each case must be examined individually, with particular focus on what the officer knew and how he responded."  <u>Dale v. Poston</u>, 548 F.3d 563, 569 (7th Cir. 2008).  As the Seventh Circuit has explained:

> [I]n order to hold an individual defendant liable under § 1983 for a violation of an inmate's constitutional rights, the inmate must show

> that the defendant was personally responsible
> for that violation. A defendant will be deemed
> to have sufficient personal responsibility if he
> directed the conduct causing the constitutional
> violation, or if it occurred with his knowledge or
> consent. While the defendant need not have
> participated directly in the deprivation of the
> plaintiff's constitutional right to be held liable,
> he or she must nonetheless have known about
> the conduct, facilitated it, approved it,
> condoned it, or turned a blind eye for fear of
> what they might see.

Rasho v. Elyea, 856 F.3d 469, 478 (7th Cir. 2017) (cleaned up).

Similarly, liability under section 1983 "is direct rather than vicarious." Horshaw v. Casper, 910 F.3d 1027, 1029 (7th Cir. 2018) (citations omitted). High-ranking officials and supervisors "are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." Id. Still, an official "responsible for setting prison policy can be held liable for a constitutional violation if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." Sinn v. Lemmon, 911 F.3d 412, 423 (7th Cir. 2018) (citing Steidl v. Gramley, 151 F.3d 739, 741 (7th Cir. 1998)) (cleaned up). "[I]f a plaintiff presents evidence showing that a substantial risk of inmate

attacks was longstanding and pervasive or noted by prison officials in the past, and a defendant has been exposed to information regarding the risk, then the evidence could be sufficient to permit a trier of fact to find that the official in fact had actual knowledge." Mayoral v. Sheahan, 245 F.3d 934, 938–39 (7th Cir. 2001).

Defendants do not meaningfully dispute that sexual assault constitutes an "objectively serious" harm.  Defendants' motion for summary judgment on Count I, therefore, turns on the scope and detail of their foreknowledge and the adequacy of their response. To defeat summary judgment, Ms. Heilman must present "enough evidence for a reasonable jury to conclude that" Defendants actually knew that she "faced an ongoing, substantial risk of serious harm," and failed to act to abate that risk.  Balsewicz v. Pawlyk, 963 F.3d 650, 658 (7th Cir. 2020).

## 1. Defendants are not entitled to qualified immunity from Count I.

As a threshold matter, Defendants all seek qualified immunity on Count I.  Defendants contend that Ms. Heilman "cannot show that [the] facts fall under clearly established law that would

overcome Defendants' qualified immunity." Defs.' Mot. Summ. J., d/e 103, at 28.

Qualified immunity insulates public employees from liability for money damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Van den Bosch v. Raemisch, 658 F.3d 778, 786 (7th Cir. 2011) (citing Pearson v. Callahan, 555 U.S 223, 231 (2009)). In evaluating a qualified-immunity defense, this Court asks two questions: whether "the facts that a plaintiff has alleged make out a violation of a constitutional right," and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." See id. (cleaned up). A clearly established right is one that "is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." Zimmerman v. Doran, 807 F.3d 178, 182 (7th Cir. 2015) (citing Mullenix v. Luna, 577 U.S. 7, 12 (2015)).

Here, Ms. Heilman charges that Defendants knew she faced an acute risk of harm from her cellmate but failed to mitigate it.

"There can be no debate" that prisoners have a clearly established right "to be free from deliberate indifference to rape and assault." Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005); see also Schwenk v. Hartford, 204 F.3d 1187, 1197 (9th Cir. 2000) ("In the simplest and most absolute of terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault [in the mid-1990s], and no reasonable prison guard could possibly have believed otherwise."). Still, Defendants contend that the allegations here fall outside the clearly established scope of the Eighth Amendment. The Court finds otherwise.

The right of prisoners to be free from sexual assault is both well established and expansive. See, e.g., id. In Farmer, the Supreme Court "made clear that being violently assaulted by a fellow inmate in prison is a serious harm." Balsewicz, 963 F.3d at 657 (citing Farmer, 511 U.S. at 834). The Farmer Court "also made clear what a prison official must do when he learns that an inmate faces an excessive danger of such a harm: take reasonable measures to abate the danger." Id. (citing Farmer, 511 U.S. at 832–33). This right obtains even when "the specific identity of the

ultimate assailant is not known in advance." <u>Brown v. Budz</u>, 398

F.3d 904, 915 (7th Cir. 2005) (citing <u>Farmer</u>, 511 U.S. at 843).  It

does not matter whether the official knew that the prisoner-plaintiff

"was especially likely to be assaulted by the specific prisoner who

eventually committed the assault." <u>Farmer</u>, 511 U.S. at 843.  Nor

does it matter "whether a prisoner faces an excessive risk of attack

for reasons personal to him or because all prisoners in his situation

face such a risk." <u>Id.</u>

This Court must "approach the qualified-immunity inquiry by

treating as true the evidence-supported facts and inferences

favoring" Ms. Heilman.  <u>Balsewicz</u>, 963 F.3d at 657 (citing <u>Orlowski</u>

<u>v. Milwaukee Cnty.</u>, 872 F.3d 417, 421–22 (7th Cir. 2017)).  Ms.

Heilman alleges that Defendants knowingly disregarded a known

risk—the sexually violent proclivities of her cellmate, Jennifer

Fleming—and failed to protect Ms. Heilman from being assaulted.

These allegations, "if accepted as true, support a viable deliberate

indifference claim." <u>Velez</u>, 395 F.3d at 736.  Granting qualified

immunity here "would essentially reward guards who put their

heads in the sand by making them immune from suit—the less a

guard knows the better.  That view is inconsistent with <u>Farmer</u>."  <u>Id.</u>
Defendants are not entitled to qualified immunity on Count I.

### 2. Summary judgment on Count I is granted to Defendants Aiken, Gerringer, and Goleash.

Ms. Heilman does not oppose the entry of summary judgment
on Count I in favor of three Defendants: Rachelle Aiken and Jacob
Gerringer, both of whom worked in Logan's placement office, and
Chase Goleash, a correctional officer assigned to Ms. Heilman's
housing unit.  <u>See</u> Pl.'s Resp., d/e 116, at 49 n.5.  Defendants'
motion for summary judgment on Count I is therefore granted as to
Ms. Aiken, Mr. Gerringer, and Officer Goleash.

### 3. Defendants Gannon, Jasmon, Lynch, and Velasquez are not entitled to summary judgment on Count I.

Defendants Justin Gannon, Kelby Jasmon, Christopher
Lynch, and Legna Velasquez were correctional officers assigned to
the dayshift in Ms. Heilman's housing unit.  These officers took no
action to mitigate the risk that Ms. Heilman might be assaulted by
Jennifer Fleming.  Defendants argue that the record contains little
evidence that these officers knew of a "specific, credible, and
imminent risk of serious harm" to Ms. Heilman.  Defs.' Mot. Summ.

J., d/e 103, at 25 (citations omitted). In response, Ms. Heilman states that she and other prisoners had put these officers on ample notice of the danger posed by Jennifer Fleming. Because a reasonable jury could agree with Ms. Heilman, her claims against these Defendants may proceed.

The Court turns first to Officer Jasmon. Ms. Heilman testified that she told Officer Jasmon "numerous times" of Jennifer Fleming's sexually harassing behavior. See Pl.'s Resp., d/e 116, at 12–13. While Officer Jasmon disputes that he received any of Ms. Heilman's complaints, he does not dispute having received similar reports from Ms. Heilman's friends and cellmates. Just two days before Ms. Heilman's assault, Ashley Underwood asked Officer Jasmon how best to handle a hypothetical case of inter-prisoner sexual harassment. Officer Jasmon responded by gesturing to his face—apparently in reference to Jennifer Fleming's facial tattoos— before cutting through the hypothetical: "Let me guess, Fleming." Defs.' Reply, d/e 120, at 35–36. Officer Jasmon then suggested that the proper response would be to "beat her ass." Id.

"Deliberate indifference can hardly be more succinctly demonstrated" than by an official recognizing a specific threat,

prescribing retributive violence, and declining to intercede further.
See Haley v. Gross, 86 F.3d 630, 642 (7th Cir. 1996). A reasonable
jury could find that Officer Jasmon already knew Ms. Heilman was
the target of Jennifer Fleming's sexual harassment. The same jury
could find Officer Jasmon's subsequent inaction unconstitutional.
Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005) (officers who
have "a realistic opportunity to step forward and prevent" harm to a
prisoner but demure are liable for deliberate indifference). Officer
Jasmon's motion for summary judgment on Count I is denied.

For similar reasons, Sgt. Gannon, Officer Lynch, and Officer
Velasquez are not entitled to summary judgment on Count I. Ms.
Heilman testified that she "directly informed" these officers of
Jennifer Fleming's aggressive behavior. See Pl.'s Resp., d/e 116, at
12–13. Ms. Heilman specifically recalled reporting to these officers
that Jennifer Fleming had routinely watched Ms. Heilman shower
and had said that she "owned [Ms. Heilman's] pussy." Id. While
Defendants contest the accuracy of Ms. Heilman's recollections, the
record also contains undisputed testimony from Defendant Annette
Veech, Logan's beauty-shop supervisor, as to her own reporting to
Sgt. Gannon. See Defs.' Reply, d/e 120, at 28–29. Shortly before

Ms. Heilman's assault, Ms. Veech called Sgt. Gannon to advise him that Ms. Heilman felt unsafe as Jennifer Fleming's cellmate. That was the first and only such call Ms. Veech made in her 25-year IDOC career. Sgt. Gannon then relayed this information to his immediate supervisor, the housing unit's zone lieutenant, "identifying Plaintiff by name." Id. at 29. The zone lieutenant responded that Ms. Heilman "can either refuse" her housing placement—thereby committing a disciplinary infraction—"or stay with that." Id.; but see Gevas, 798 F.3d at 484 ("[A] prisoner is not obligated to commit a disciplinary infraction in pursuit of his own safety."). Sgt. Gannon "did not take any further action to respond to the information that he had learned from Veech, including talking to Plaintiff or anyone else." Id.

Ms. Heilman offers additional evidence to establish that these officers' omissions amounted to deliberate indifference. This includes the conclusions reached by Cameron Lindsay, Ms. Heilman's expert on correctional practices and a former high-ranking Federal Bureau of Prisons official. In Mr. Lindsay's expert report, Mr. Lindsay concluded that Sgt. Gannon's inaction was "contrary to accepted correctional practices" and violative of "PREA

and IDOC's own policies."  Expert Report of Cameron Lindsay, d/e 113-1, at 17 ("Lindsay Report").  Mr. Lindsay further found that "[e]ach time that Ms. Heilman, her roommates and/or Ms. Underwood reported to Officer Lynch, Officer Velazquez, and/or Officer Jasmon . . . that Ms. Heilman was being harassed by Ms. Fleming or that Ms. Heilman feared Ms. Fleming," Ms. Heilman "should have been immediately sequestered from all inmates and placed in protective custody pending an investigation."  Id. at 16. In Mr. Lindsay's opinion, these officers could have prevented Ms. Heilman's assault merely by separating her from Jennifer Fleming. A reasonable jury could credit Mr. Lindsay's conclusions and thereby find in Ms. Heilman's favor.

To recap, all these Defendants deny that Ms. Heilman provided them adequate notice of Jennifer Fleming's harassing and threatening behavior.  Ms. Heilman, however, has adduced substantial evidence to the contrary.  This leaves in dispute a material question of fact: whether these officers knew Ms. Heilman "was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though [they] could have easily done so."  Armstrong v. Squadrito, 152 F.3d 564,

577 (7th Cir. 1998).  A reasonable jury could answer that question in the affirmative, and so Ms. Heilman's claims against Defendants Gannon, Jasmon, Lynch, and Velasquez may proceed.

### 4. Defendants Cox and Lounsberry are not entitled to summary judgment on Count I.

Defendants Aadam Cox and Brandon Lounsberry were correctional officers assigned to the nightshift in Ms. Heilman's unit.  Ms. Heilman alleges that these officers' failure to protect her from Jennifer Fleming that night was deliberate indifference. Because a reasonable jury could agree, Officers Cox and Lounsberry cannot receive summary judgment on Count I.

"In failure to protect cases, the debate often exclusively concerns what the prison official knew and when he knew it." Pavlick v. Mifflin, 90 F.3d 205, 210 (7th Cir. 1996).  Here, both Officers Cox and Lounsberry were present on the evening of Ms. Heilman's assault.  Both testified that they conducted "wing checks" of the housing unit—walking to one end of the wing and back— around the time of the attack.  And both testified to seeing and hearing nothing out of the ordinary, though neither officer ever entered Ms. Heilman's cell.  As the parties agree, Officers Cox and

Lounsberry were "required to be attentive to audio or visual cues that indicated that an inmate was in danger or involved in an altercation."  Defs.' Reply, d/e 120, at 38.

Ms. Heilman offered a different recollection.  For one thing, Ms. Heilman testified that nightshift wing checks are cursory at best, and that "[m]ost of the time, the third shift [overnight] officers are just sleeping at the desks" on either end of Housing Unit 8.  H. Heilman Dep., d/e 113-18, at 39:20–23.  For another, Ms. Heilman recalled that the assault created enough noise to rouse one of her sleeping cellmates, Yvonne Williams, from a bunk "[p]robably ten feet" apart from Ms. Heilman's.  Id. at 39:12–19 (Q: Did Ms. Williams or Ms. Gibbons wake up at any point in time, to your knowledge, while [the assault] was ongoing?  A: I believe Ms. Williams did.  She heard it.  She was too scared to get up."); see also Pl.'s Resp. ex. 72, d/e 113-72, at 3–4 ("WILLIAMS stated that . . . she was awoken because the bed [was] 'violently' shaking . . . [and] she heard HEILMAN state 'It hurts.'").

Drawing all inferences in Ms. Heilman's favor, the Court concludes that the parties' conflicting accounts preclude summary judgment.  A reasonable jury could credit Ms. Heilman's contention

that nightshift officers ordinarily were "just sleeping at [their] desks" and find that Officers Cox and Lounsberry never conducted their wing checks in the first place.  Moreover, a reasonable jury could conclude that if Ms. Heilman's rape was loud enough to wake a sleeping Ms. Williams, it was loud enough for Officers Cox or Lounsberry to hear from the hallway outside.  Officers Cox and Lounsberry are not entitled to summary judgment on Count I.

### 5. Defendant Veech is not entitled to summary judgment on Count I.

Defendant Annette Veech supervised Logan's beauty shop and its prisoner-employees.  Ms. Heilman worked for Ms. Veech from January 2017 until her assault a month later.  Ms. Heilman alleges that she repeatedly told Ms. Veech that she feared being harmed by Jennifer Fleming and that Ms. Veech failed to take sufficient responsive action.  Because a reasonable jury could agree, Ms. Veech's motion for summary judgment on Count I is denied.

As the parties agree, Ms. Heilman discussed her reservations regarding Jennifer Fleming with Ms. Veech on several occasions. The parties dispute only the details.  Ms. Heilman testified that she "told Veech about Fleming's aggressive and harassing behavior

toward [Ms. Heilman] and reported to Veech that she was fearful of Fleming and her actions." See Pl.'s Resp., d/e 116, at 52. Ms. Veech contends that Ms. Heilman's complaints were far less alarming. Ms. Veech concedes, however, that she told Ms. Heilman that she was "so sorry" about her placement with Jennifer Fleming, whom she knew to be "troubled," and offered Ms. Heilman "anything [she could] do to help." Defs.' Reply, d/e 120, at 25. As Ms. Heilman rightly argues, a reasonable jury easily could find that Ms. Veech knew enough about Ms. Heilman's predicament to come under a constitutional duty to protect her.

The question remains whether Ms. Veech satisfied that duty. Under Farmer and its progeny, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844 (emphasis added). Here, Ms. Veech called Sgt. Justin Gannon "to inquire about getting Plaintiff's housing assignment changed." Defs.' Reply, d/e 120, at 28–29. By her own admission, over a 25-year career with IDOC, Ms. Veech had never made another call to a correctional officer out of concern for a prisoner's well-being.

A reasonable jury could find that Ms. Veech was obligated to do more than place a single phone call.  After all, Ms. Veech knew enough of Jennifer Fleming to offer Ms. Heilman "anything [she] could do to help" <u>before</u> Ms. Fleming had even moved into Ms. Heilman's cell.  Although Ms. Veech was a civilian beauty-shop supervisor, not an armed correctional officer, Ms. Heilman still was committed to Ms. Veech's care.  Construing the record in Ms. Heilman's favor—as the Court must—Ms. Heilman's escalating complaints of sexual harassment and articulations of her fear for her personal safety warranted more decisive action.  Ms. Veech's motion for summary judgment on Count I is denied.

### 6. Defendants Price and Sexton are not entitled to summary judgment on Count I.

Defendants Todd Sexton and Nicole Price comprised Logan's two-person Internal Affairs team.  In that capacity, Maj. Sexton and Officer Price were responsible for investigating allegations of staff and prisoner misconduct.  Ms. Heilman alleges that, in the weeks leading up to her assault, she and her cellmates sent Internal Affairs several "request slips," or written complaints, regarding Jennifer Fleming's harassing behavior.  Maj. Sexton and Officer

Price concede that those request slips were submitted and that they took no action in response, but they deny they ever received the request slips. They now move for summary judgment.

Logan instructed its prisoners to report sexual misconduct and harassment by one of two means: calling the facility's PREA hotline or submitting a request slip to Internal Affairs. See Pl.'s Resp. ex. 28, d/e 113-28, at 25 (IDOC resident-handbook section entitled "How to report sexual abuse"). Ms. Heilman "submitted two request slips to Internal Affairs on approximately January 21 and January 28[, 2017,] reporting that Fleming had moved into her room and was sexually harassing her." Defs.' Reply, d/e 120, at 30. "Around the same time," Ms. Heilman's two other roommates "each submitted a request slip . . . reporting that Plaintiff was being sexually harassed by Fleming as well." Id. All three women submitted their complaints "by placing them inside a locked box in Housing Unit 8 near the officer's desk that is designated for request slips." Id. Request slips ordinarily were collected the day they were submitted and "hand[ed] over" to Maj. Sexton and Officer Price the next day. Id. at 31–32. Maj. Sexton later testified that "he was not aware of any issues with proper and timely delivery of request slips

through the institutional mail system." Id. at 31. "Neither Plaintiff nor her roommates received any responses to their request slips," and neither Maj. Sexton nor Officer Price "ever took any action in response." Id. at 32.

Maj. Sexton and Officer Price dispute none of this. Rather, they argue that the absence of any affirmative evidence that they received the request slips disposes of Ms. Heilman's claims against them. These officers contend that because "Plaintiff did not direct her letter to any particular person" and instead directed her request slips "to the internal affairs office," nothing in the record supports "an inference that either Price or Sexton received it." See Defs.' Mot. Summ. J., d/e 103, at 18 (citing Horshaw, 910 F.3d at 1029).

This argument misconstrues the Seventh Circuit precedent on which it relies. The plaintiff in Horshaw v. Casper, a prisoner at the Menard Correctional Center, sued several correctional officers and prison officials—including the facility's warden—for failing to protect him from a brutal gang attack. Mr. Horshaw testified that he "wrote a note to [the warden]" seeking protection from his eventual assailants, "put [the warden's] name on the envelope, and saw a guard collect the note for delivery." Horshaw, 910 F.3d at

1029.  The warden "pitche[d] his defense entirely on a contention

that he did not receive Horshaw's note" and provided testimony to

that effect.  Id.  This was enough for the district court, which found

"that the absence of a notation in [the warden's] office files showing

receipt of the note" and the warden's testimony meant "that the

note was not delivered to him," and so granted the warden

summary judgment.  Id.

The Seventh Circuit reversed.  According to Judge

Easterbrook, the district court's decision contravened a well-

established evidentiary principle—that "[p]lacing the note in the

prison mail system supports an inference of receipt."  Id. (citing

Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).  The

parties' competing accounts, therefore, made it "inappropriate to

grant summary judgment."  Id.  As Judge Easterbrook explained:

> Maybe Horshaw is lying or unable to remember
> accurately what happened, or maybe the guard
> who picked up the note threw it away—though
> the record contains evidence that this prison's
> internal-mail system functions consistently
> well. But maybe Atchison saw the note and
> forgot it, or maybe the staff is lying about what
> the prison's records show, or the records have
> been altered. A reasonable jury could resolve
> this conflict either way.

Id.

Horshaw's logic controls here.  The parties agree that Ms.
Heilman and her cellmates reported their concerns through the
proper channels.  The record also supports the notion that, as at
Menard, Logan's "internal-mail system functions consistently well."
See id.  All of this "supports an inference of receipt" by Internal
Affairs—that is, by Maj. Sexton and Officer Price.  See id.  Moreover,
"Sexton and Price were each familiar with Fleming, a prisoner that
Price described as 'well-known' at Logan because of her extensive
disciplinary history."  Defs.' Reply, d/e 120, at 30–31.  Given the
nature of the women's complaints and Jennifer Fleming's
reputation, Maj. Sexton and Officer Price would have needed to
"separate the alleged victim (Plaintiff) from the alleged perpetrator
(Fleming)" and investigate further.  Id. at 31–32; see Horshaw, 910
F.3d at 1029 (prison official's concession that "had he received a
copy" of a letter from prisoner-plaintiff conveying fear of attack, "he
would have put [prisoner] in protective custody immediately,"
supported inference that officials knew the prisoner's fear was not
"false or hollow").  As all agree, however, Maj. Sexton and Officer
Price took no action regarding Jennifer Fleming.  A reasonable jury

could find that these officers received the request slips but "inexplicably ignored" them.  See Gidarisingh v. Pollard, 571 F. App'x 467, 470 (7th Cir. 2014).  Their motion for summary judgment on Count I is denied.

### 7. Defendant Burke is not entitled to summary judgment on Count I.

Defendant Margaret Burke was Logan's warden at all relevant times.  Throughout late 2016 and early 2017, Warden Burke spearheaded an effort to repurpose Logan's maximum-security D-Wing and to disperse its residents—including Jennifer Fleming—throughout the facility's mixed-security housing units.  Ms. Heilman alleges that Warden Burke was deliberately indifferent "to the known risk of harm that prisoners like Plaintiff faced as a result."  Pl.'s Resp., d/e 116, at 65 (citing Haywood v. Hathaway, 842 F.3d 1026, 1031 (7th Cir. 2016)).  Warden Burke now moves for summary judgment, arguing that the record does not support a finding that Ms. Heilman's assault was either attributable to Warden Burke's actions or "anything more than [an] unfortunate random act of violence in a prison."  See Defs.' Mot. Summ. J., d/e 103, at 22.  Warden Burke is incorrect.

Warden Burke first argues that she had no "personal
involvement in the specific conduct at issue here." Id. at 17.  She
contends that she "simply did not know about the underlying
conduct." Id.  But Warden Burke's argument misses the gravamen
of Ms. Heilman's allegations against her: that Warden Burke knew
repurposing D-Wing would be dangerous to prisoners like Ms.
Heilman but took no reasonable measures to mitigate that danger.
This claim alleges personal involvement; it also sounds in well-
established Eighth Amendment law.  "Individual defendants like
[Warden Burke], who are responsible for setting prison policy, can
be held liable for a constitutional violation if they are aware of a
systematic lapse in enforcement of a policy critical to ensuring
inmate safety yet fail to enforce that policy." Sinn, 911 F.3d at 423
(citing Steidl, 151 F.3d at 741) (cleaned up).  "[I]f a plaintiff presents
evidence showing that a substantial risk of inmate attacks was
longstanding and pervasive or noted by prison officials in the past,
and a defendant has been exposed to information regarding the
risk, then the evidence could be sufficient to permit a trier of fact to
find that the official in fact had actual knowledge." Mayoral v.
Sheahan, 245 F.3d 934, 938–39 (7th Cir. 2001).  "A risk of serious

harm may be shown, for example, by evidence of a series of bad acts that the policymaking level of government was bound to have noticed, like a pervasive pattern of assaults or the existence of an identifiable group of prisoners at particular risk of assault." Smith v. Sangamon Cnty. Sheriff's Dep't, 715 F.3d 188, 192 (7th Cir. 2013) (cleaned up).

On the merits, Warden Burke contends that the record contains "no evidence that the reorganization [of D-Wing] was undertaken with deliberate indifference."  Defs.' Mot. Summ. J., d/e 103, at 22–23.  Ms. Heilman disputes that characterization, pointing to Warden Burke's "admitted awareness of the risk of harm to prisoners like Plaintiff" and to evidence suggesting that Warden Burke took little preventive action.  Pl.'s Resp., d/e 116, at 63–65. The Court finds that Ms. Heilman has raised genuine questions of material fact as to Warden Burke's knowledge of the danger posed by closing D-Wing and the adequacy of the steps she took to mitigate that danger.  Summary judgment is, therefore, inappropriate.

A reasonable jury could find that Warden Burke knew that repurposing D-Wing and reassigning its residents elsewhere

endangered the facility's general population.  Indeed, Warden Burke

admitted as much in her deposition:

> Q: You knew that closing D Wing and putting
> the prisoners who were housed there into
> general population would cause a risk to the
> safety and security of other prisoners in the
> facility; correct?
>
> A: I knew that making a change of repurposing
> D Wing and moving offenders who have been
> kept in their rooms for 20-plus hours a day was,
> yes, a risk.
>
> Q: Specifically[,] that it was a risk to the safety
> of the other prisoners who they would be living
> with after the move; right?
>
> A: That it would be a risk to—yes, for them to
> live in a housing unit with other people, yes.

M. Burke Dep., d/e 113-5, at 76:16–77:6.  Warden Burke further

admitted that several staff members and stakeholders, including

the facility's union representatives, advised her against closing D-

Wing.  Id. at 61:6–12; see also Defs.' Reply, d/e 120, at 20 ("It is

undisputed and material that some staff members communicated

concerns about the repurposing of D Wing and transferring the

prisoners, yet Warden Burke had multiple reasons for continuing

with the change.").  And Warden Burke acknowledged that the risk

of sexual violence and misconduct was especially acute at Logan,

conceding that Logan had "more PREA complaints than other facilities within the IDOC on a typical annual basis."  M. Burke Dep., d/e 113-5, at 130:15–23; <u>see also</u> A. Wilson Dep., d/e 113-6, at 51:15–22 (testifying that Logan "had hundreds of PREA allegations" between June 2016 and June 2018).  This testimony alone could lead a reasonable jury to find that Warden Burke knew that closing D-Wing would engender "deficiencies that directly threatened the welfare of prisoners for whom [she] was responsible." <u>Haywood</u>, 842 F.3d at 1033.

Another dispute of material fact lies in Warden Burke's response to those deficiencies.  "Once prison officials know about a serious risk of harm, they have an obligation to take reasonable measures to abate it."  <u>Dale</u>, 548 F.3d at 569.  Warden Burke testified to adding an additional officer to each wing, increasing "supervisory rounds," and instilling an "expectation that everyone be more mindful of the unit itself and to try to put out fires before they start."  M. Burke Dep., d/e 113-5, at 77:7–78:23.  However, other officials provided contrary testimony.  For instance, Sgt. Gannon testified that D-Wing's closure came "overnight" and left correctional officers "shocked."  <u>See</u> J. Gannon Dep., d/e 113-7, at

38:1–24.  Maj. Sexton, too, could not recall Warden Burke taking any steps to address his and other officers' concerns about dispersing D-Wing prisoners throughout Logan's general population.  T. Sexton Dep., d/e 113-43, at 60:13–17 ("Q: To your knowledge, did Warden Burke ever take any action to address the concerns that you had regarding the risk to the safety of inmates and staff at Logan from the repurposing of D wing?  A: To the best of my knowledge, no.").  This testimony is corroborated by uncontroverted documentary evidence showing "that no staffing modifications" were made in the months between D-Wing's closure and Ms. Heilman's assault.  Defs.' Reply, d/e 120, at 21–22.

Based on the evidence marshalled by Ms. Heilman, a reasonable jury could find that Warden Burke "disregarded the serious concerns raised by staff, dug in her heels, and acted quickly so that staff could not raise their concerns about the decision with other who might interfere."  See Lindsay Report, d/e 113-1, at 23.  The same jury could find that Warden Burke's response to the specter of violence raised by closing D-Wing was inadequate, if not "plainly inappropriate."  See Hayes v. Snyder, 546 F.3d 516, 524

(7th Cir. 2008).  Warden Burke's motion for summary judgment on Count I is denied.

### 8. Defendant Wilson is not entitled to summary judgment on Count I.

Defendant Angel Wilson served as Logan's Assistant Warden of Programs and PREA compliance manager in the year leading up to Ms. Heilman's assault.  Ms. Heilman alleges that although her mother called Ms. Wilson and explicitly conveyed her fear for Ms. Heilman's safety, Ms. Wilson took no reasonable action in response.  Ms. Wilson argues that "no reasonable jury could [find] these facts to rise to the level necessary" for Eighth Amendment liability.  Defs.' Mot., d/e 103, at 26 (citing Riccardo v. Rausch, 375 F.3d 521, 527 (7th Cir. 2004)).  Again, the Court finds otherwise.

The parties largely agree on Ms. Wilson's role.  Ms. Wilson received at least one phone call from Wendy Earhart, Ms. Heilman's mother, in which Ms. Earhart "expressed . . . concern for her daughter" because of Ms. Heilman's placement with Jennifer Fleming.  Defs.' Reply, d/e 120, at 33.  Within a few days of speaking with Ms. Earhart, Ms. Wilson "happened to see Plaintiff walking outside on the grounds as Wilson was walking to the health

care unit." Id. at 34. "While on the walkway in the middle of the institution—in an outdoor setting with no privacy—Wilson told Plaintiff that her mother had called and asked Plaintiff 'if everything was okay in her room[.]'" Id. Ms. Heilman "told her it was fine." Id. At some point, Ms. Wilson told Defendant Beatrice Calhoun, then Logan's Assistant Warden of Operations, about Ms. Earhart's phone call. Ms. Wilson took no further action.

Ms. Heilman identifies several genuine disputes of material fact regarding Ms. Wilson's knowledge and response. The most important of these disputes concerns the substance of Ms. Earhart's complaint to Ms. Wilson. According to Ms. Wilson, Ms. Earhart said only that her daughter "was being picked on." See Defs.' Reply, d/e 120, at 32. Yet Ms. Earhart asserted, in a sworn statement, that she "express[ed] concern over Jennifer Fleming, her threatening behavior toward Haley, and Haley's safety and housing placement." Earhart Aff. ¶ 3, d/e 113-67. Ms. Earhart further attested to placing at least three or four calls to that effect. Id. ¶ 5. "[A]ny warden worth his or her salt would consider such an allegation sufficient to commence an aggressive investigation." Santiago v. Walls, 599 F.3d 749, 759 (7th Cir. 2010). A reasonable

jury, therefore, could find that Ms. Earhart provided Ms. Wilson

ample notice of a specific, credible threat of harm to Ms. Heilman.

See, e.g., Gevas, 798 F.3d at 481 (defendants informed of the

identity of individual making threats, nature of threats, and

underlying context); see also LaBrec v. Walker, 948 F.3d 836, 843

(7th Cir. 2020) (collecting cases).

Ms. Heilman points to still other questions regarding the

adequacy of Ms. Wilson's response.  Ms. Wilson began her

investigation by asking Ms. Heilman, in public and within earshot

of other prisoners and staff, whether "everything was okay in [Ms.

Heilman's] room."  Defs.' Reply, d/e 120, at 34.  As Ms. Wilson later

testified, her investigation ended there:

> Q: After [Ms. Heilman] said that everything was
> fine, did you follow up with any further
> questions as to her living situation?
>
> A: No.
>
> Q: Why not?
>
> A: Because I probably didn't have time.
>
> Q: Did you assign anybody else to follow up with
> Ms. Heilman?
>
> A: No.

Q: Why not?

A: Because she had a counselor she could have gone to.

See A. Wilson Dep., d/e 113-6, at 23:13–24.

Ms. Wilson contends that she cannot be liable for failing to do more, for "any knowledge of an issue was resolved when Plaintiff told her she was fine." Defs.' Mot. Summ. J., d/e 103, at 26 (citing Riccardo, 375 F.3d at 527). Yet a reasonable jury could find otherwise. Construing the record in the light most favorable to Ms. Heilman, the evidence indicates that Ms. Wilson knew Jennifer Fleming had a long and often violent disciplinary record. See A. Wilson Dep., d/e 113-6, at 77:2–14. Ms. Wilson's foreknowledge would have lent significant credibility to Ms. Earhart's reports. Ms. Wilson's familiarity with Jennifer Fleming also would have made Ms. Heilman's public demurral less impactful. Compare N. Bartlemay Dep., d/e 113-8, at 95:8–9 ("A: I mean, I think every staff member out there knew who Jennifer Fleming was.") with Riccardo, 375 F.3d at 527 (because officer "knew that [assailant] had a clean record in prison," it was "reasonable for [officer] to have deemed [prisoner's] initial protestation unjustified").

For another thing, the record contains substantial evidence that Ms. Wilson's conversation with Ms. Heilman was unhelpful at best and dangerous at worst.  Cameron Lindsay, Ms. Heilman's expert on correctional practices, concluded that Ms. Wilson's actions were "grossly inappropriate."  Lindsay Report, d/e 113-1, at 18.  According to Mr. Lindsay, "[w]ardens and assistant wardens know that it is inappropriate to share" such details "in a public setting because if the target of those concerns is within earshot, it would <u>increase</u>, rather than decrease, the risk facing the inmate."  <u>Id.</u> at 19.  Beatrice Calhoun, too, testified that such a conversation "[a]bsolutely" should have occurred in private.  <u>See</u> B. Calhoun Dep., d/e 113-9, at 21:21–23:17; <u>see also</u> Defs.' Reply, d/e 120, at 34–35 ("Calhoun testified that Wilson's actions and inaction were inappropriate and concerning.").  A reasonable jury could find that Ms. Wilson's actions placed Ms. Heilman in more danger, not less.

In sum, a reasonable jury could conclude that Ms. Wilson knew well that Jennifer Fleming posed a serious threat to Ms. Heilman's safety.  The same jury could find that Ms. Wilson failed to act not because Ms. Heilman had "resolved" any lingering questions

about her safety, but because Ms. Wilson simply "didn't have time." Ms. Wilson's motion for summary judgment on Count I is denied.

### 9. Defendant Calhoun is not entitled to summary judgment on Count I.

Defendant Beatrice Calhoun was Logan's Assistant Warden of Operations in the months leading up to Ms. Heilman's assault. Ms. Heilman alleges that Ms. Calhoun knew of Angel Wilson's telephone call (or calls) with Ms. Heilman's mother, Wendy Earhart, and did nothing in response. Ms. Calhoun now seeks summary judgment on Count I. She contends that no reasonable jury could conclude that she had sufficient knowledge of Ms. Earhart's complaints before Ms. Heilman's assault. However, as with Ms. Wilson, the extent and timing of Ms. Calhoun's knowledge remain in dispute. Ms. Calhoun's motion for summary judgment on Count I is denied.

### 10. Defendants Carter and Singleton are not entitled to summary judgment on Count I.

Defendant Guy Carter served as a counselor in Logan's Reception & Classification Center until January 2017. Mr. Carter completed Jennifer Fleming's classification assessment upon her arrival at Logan. Ms. Heilman charges that Mr. Carter failed "to

properly review Fleming's disciplinary history" before settling on an "improper PREA classification," thereby "expos[ing] Plaintiff (and other prisoners at Logan) to a heightened risk of sexual abuse." Pl.'s Resp., d/e 116, at 66.  Mr. Carter contends that no reasonable jury could find him liable for his "limited role[]" in the causal chain leading to Ms. Heilman's assault.  Defs.' Mot. Summ. J., d/e 103, at 19.  The Court disagrees.

The undisputed record reflects that Mr. Carter "performed Fleming's initial classification in September 2016, including the screening for Fleming's risk of sexual abusiveness," and assigned her a "0 on all five predatory factors."  Defs.' Reply, d/e 120, at 9–11.  Mr. Carter testified that parsing a prisoner's disciplinary history "to determine whether they had a history of institutional sexual[ly] abusive behavior" was "important."  G. Carter Dep., d/e 113-17, at 60:16–20.  But although Mr. Carter "had access to" Jennifer Fleming's "disciplinary tracking at the time she came in," he testified that he likely did not review any of it.  Id. at 60:11–13. Mr. Carter conceded that he "declined to indicate" on Jennifer Fleming's PREA screening documentation "that Ms. Fleming had a history of institutional sexual abuse," despite a disciplinary history

that included a charge of sexual misconduct against a staff member.  <u>Id.</u> at 83:8–14.  Further, Mr. Carter admitted that he made the same decision on Jennifer Fleming's "history of institutional assaultive and violent behavior," despite her lengthy history of assaulting staff and prisoners.  <u>Id.</u> at 83:18–86:19; <u>see also</u> <u>id.</u> at 86:20–23 ("Q: As you sit here today, you are not aware of any justification for answering the question in the negative, correct? A: Correct.").  Mr. Carter's assessment scored Jennifer Fleming as having the same predatory risk, "not likely," as Ms. Heilman.

A reasonable jury could come to two possible explanations. On the one hand, the record contains considerable evidence that Jennifer Fleming, who had incurred more than 400 disciplinary infractions before assaulting Ms. Heilman, posed an ongoing and widely known threat to her fellow prisoners.  All this evidence was available to Mr. Carter.  If the factfinder concludes that Mr. Carter reached his conclusions <u>after</u> reviewing that history, then Mr. Carter is liable for deliberate indifference to Ms. Heilman's safety and security.  <u>E.g.</u>, <u>Dale</u>, 548 F.3d at 569 ("If the prison officials know that there is a cobra [living with other prisoners] or at least that there is a high probability of a cobra there, and do nothing,

that is deliberate indifference.").  On the other hand, the record also could allow a reasonable factfinder to find that Mr. Carter flatly neglected to review Ms. Fleming's history.  That, too, would leave him deliberately indifferent.  As the Seventh Circuit has held—in no uncertain terms—the "failure of prison authorities to even review an inmate's file to determine his or her proclivity for violence . . . manifest[s] utter disregard for the value of human life."  Walsh v. Mellas, 837 F.2d 789, 798 (7th Cir. 1988).  Mr. Carter's motion for summary judgment on Count I is denied.

The same considerations obtain in the case of Defendant Troy Singleton, "the casework supervisor for [Reception & Classification] and Carter's immediate supervisor."  Defs.' Reply, d/e 120, at 7. Mr. Singleton oversaw Mr. Carter's "initial screening for [Jennifer Fleming's] risk of sexual victimization and abusiveness," id., and reviewed and finalized Mr. Carter's assessment, id. at 13.  Like Mr. Carter, Mr. Singleton "had access to Fleming's disciplinary history, master file, and criminal history when conducting his review of Fleming's classification."  Id.  Like Mr. Carter, Mr. Singleton "admitted that his practice . . . was to rely on the prisoner's self-report about her disciplinary history, gang affiliation, and criminal

history, which he had no way to verify." Id. at 13–14.  Mr. Singleton "did not correct any portion of the screening instrument reflecting Fleming's screening for risk of sexual abusiveness, and instead marked Fleming as 'not likely' on the predatory continuum." Id. at 14; see also Pl.'s Resp. ex. 36, d/e 113-16, at 2–8.

Mr. Singleton asserts that he lacks "any connection to Plaintiff's claims or the incident at issue in this suit."  Defs.' Mot. Summ. J., d/e 103, at 15–16.  Yet Mr. Singleton bore principal responsibility for ensuring the accuracy of Jennifer Fleming's risk assessment.  But for Mr. Singleton's cursory review and sign-off, Ms. Heilman may have never crossed paths with Jennifer Fleming. A reasonable jury could find that Mr. Singleton, like Mr. Carter, knew that relying only on Jennifer Fleming's disciplinary autobiography put other, more vulnerable prisoners at an acute risk of harm.  See Lindsay Report, d/e 113-1, at 20 (concluding that these classification practices evinced "a blatant disregard of [a] known risk and put inmates like Ms. Heilman at risk of assault by Ms. Fleming"); see also G. DeJarnette Dep., d/e 113-24, at 30:13–17 ("Q: Would it be fair to say that if you failed to adequately perform a screening it could place a prisoner at a greater risk of

sexual assault?  A: If a PREA screening is done incorrectly, then, yeah, there could be a danger of that.").  Mr. Singleton's motion for summary judgment on Count I is denied.

### 11. Defendant Edwards is not entitled to summary judgment on Count I.

The Court reaches a similar conclusion on Defendant Joshua Edwards, who placed Jennifer Fleming in Ms. Heilman's room in January 2017.  Ms. Heilman claims that Officer Edwards "knew, or should have known, that Fleming would pose a risk of harm to Plaintiff and disregarded it."  Pl.'s Resp., d/e 116, at 69–70 (citing Santiago, 599 F.3d at 758).  In support of his motion for summary judgment, Officer Edwards contends both that his role was "too tangential to be sufficient for personal liability," see Defs.' Mot. Summ. J., d/e 103, at 19, and that Jennifer Fleming "was not an obvious risk" when he paired her with Ms. Heilman, id. at 21.  A reasonable jury could find against Officer Edwards on both fronts.

As the sole employee in Logan's placement office, Officer Edwards essentially had "free reign" in making room-assignment decisions.  Defs.' Reply, d/e 120, at 24.  "[W]hen placing prisoners, [Officer Edwards] had access to all classification information of the

women in the cells he was considering placing a prisoner into,"
including that of Jennifer Fleming, Ms. Heilman, and their
roommates.  Id.  And Officer Edwards "was familiar with Fleming
and her penchant for disciplinary infractions."  Id.  All this places
Officer Edwards in the same position as Mr. Carter and Mr.
Singleton.  Given Officer Edwards' admitted foreknowledge of
Jennifer Fleming—and given her acknowledged reputation for
violence and insubordination—a reasonable jury could find that
Officer Edwards' carelessness was recklessness.  The same jury,
therefore, could find that Officer Edwards' decision to place a
"cobra" in Ms. Heilman's room derived from his deliberate
indifference.  See Dale, 548 F.3d at 569.  Officer Edwards' motion
for summary judgment on Count I is denied.

### 12. Summary judgment on Count I is granted to Defendant DeJarnette.

Defendant Greg DeJarnette was a counselor in Logan's
Reception & Classification Center.  Ms. Heilman claims that Mr.
DeJarnette's assessment of her place on the victim-predator
continuum bore the same infirmities as did Mr. Carter's and Mr.
Singleton's evaluations of Jennifer Fleming.  Specifically, Ms.

Heilman alleges that Mr. DeJarnette "failed to properly classify" her as a likely victim because he relied entirely on Ms. Heilman's own reporting, thereby exposing Ms. Heilman to an increased risk of harm.  Pl.'s Resp., d/e 116, at 24–25.  However, no reasonable jury could find Mr. DeJarnette's actions either causally relevant or deliberately indifferent.  Mr. DeJarnette's motion is granted.

As the parties evidently agree, Mr. DeJarnette played a limited role in the underlying events.  Mr. DeJarnette performed Ms. Heilman's intake assessment and PREA screening upon her arrival at Logan in September 2016.  Mr. DeJarnette assessed Ms. Heilman's "vulnerability" risk as "Likely," with a score of eight out of ten possible points.  This designation relied solely on information provided by Ms. Heilman.  See G. DeJarnette Dep., d/e 113-24, at 48:3–5 ("A: . . . All I know is that, you know, this is a PREA screening, it's all self[-]reported.").  A month later, Mr. Carter rescreened Ms. Heilman and downgraded her vulnerability score from eight points to six, thereby placing Ms. Heilman at a "Moderately Likely" risk of victimization.

The record suggests that Logan's PREA screening program rested entirely on prisoners' self-reporting rather than documentary

evidence.  Id. at 47:17–22 ("Q: So are there -- when you're doing the intake itself, do you ever look at documents that would relate to an offender's disciplinary history?  A: No.  We just do the assessment.  We, you know, don't review other documents.").  Mr. DeJarnette's evaluation adhered to this low standard.  Yet the upshot of that initial assessment—that Ms. Heilman was at relatively high risk of victimization—was, by all accounts, correct.  It is telling that Ms. Heilman addresses Mr. DeJarnette's liability only in passing; the Court can find no authority holding that an official who rightly assesses a prisoner's susceptibility to harm can be liable for deliberate indifference.  Mr. DeJarnette's motion for summary judgment on Count I is granted.

**B. Defendants' Motion for Summary Judgment on Count II is Granted.**

Count II alleges that the three highest-ranking Defendants—Warden Margaret Burke, Assistant Warden Beatrice Calhoun, and Assistant Warden Angel Wilson—are liable for their failure to provide Logan's employees with adequate training.  Since Ms. Heilman does not contest Defendants' motion for summary

judgment on Count II, <u>see</u> Pl.'s Resp., d/e 116, at 49 n.5, that

motion is granted.

**C. Defendants' Motion for Summary Judgment on Count III is Granted in Part and Denied in Part.**

Count III alleges that Defendants are liable for willful and

wanton conduct.  Illinois law defines this claim as one alleging "a

course of action which shows an actual or deliberate intention to

cause harm or which, if not intentional, shows an utter indifference

to or conscious disregard for the safety of others or their property."

<u>Chapman v. Keltner</u>, 241 F.3d 842, 847 (7th Cir. 2001) (citing 745

ILCS 10/1–210).  Under binding Circuit precedent, a correctional

official's liability for willful and wanton conduct is coextensive with

his liability for deliberate indifference.  This means that Defendants'

entitlement to summary judgment on Count I determines the same

on Count III.

**1. Summary judgment on Count III is granted to Defendants Aiken, DeJarnette, Gerringer, and Goleash.**

The above-named Defendants received summary judgment on

Count I.  These Defendants cannot be held liable for willful and

wanton conduct if they are not liable for deliberate indifference.

Defendants Aiken, DeJarnette, Gerringer, and Goleash are therefore
entitled to summary judgment on Count III.

> ## 2. Defendants Burke, Calhoun, Carter, Cox, Edwards, Gannon, Jasmon, Lounsberry, Lynch, Price, Sexton, Singleton, Wilson, Veech, and Velasquez are not entitled to summary judgment on Count III.

Defendants Burke, Calhoun, Carter, Cox, Edwards, Gannon,
Jasmon, Lounsberry, Lynch, Price, Sexton, Singleton, Wilson,
Veech, and Velasquez moved unsuccessfully for summary judgment
on Count I.  They offer two arguments why they should receive
summary judgment on Count III.  Both arguments are unavailing.

Defendants first invoke statutory sovereign immunity.  They
claim that "any tort that arises in this case should be pursued in
the Illinois Court of Claims."  Defs.' Mot. Summ. J., d/e 103, at 33.
Defendants are incorrect.  The State Lawsuit Immunity Act, 745
ILCS 5 et seq., protects Illinois and its employees from being "made
a defendant or party in any court except as provided in the Court of
Claims Act."  See 745 ILCS 5/1.  This protection "cannot be evaded
by making an action nominally one against the servants or agents
of the State."  Sass v. Kramer, 381 N.E.2d 975, 977 (Ill. 1978).  As
the Illinois Supreme Court has reasoned:

> [W]hen there are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State, then the cause of action is only nominally against the employee.

Healy v. Vaupel, 549 N.E.2d 1240, 1247 (Ill. 1990).

Of course, "servants or agents of the State" do not enjoy complete sovereign immunity.  One exception "applies whenever 'agents of the State have acted in violation of statutory or constitutional law.'"  Murphy v. Smith, 844 F.3d 653, 659 (7th Cir. 2016), aff'd on other grounds, 583 U.S. ___, 138 S. Ct. 784 (2018) (quoting Leetaru v. Bd. of Trustees of Univ. of Illinois, 32 N.E.3d 583, 597 (Ill. 2015)).  Such claims "are not against the State at all and do not threaten the State's sovereign immunity."  Leetaru, 32 N.E.3d at 598.  "This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not."  Id. at 596; see also Murphy, 844 F.3d at 661–62 (Manion, J., concurring) (concluding that the Illinois Supreme Court "would hold that"

officers found liable for deliberate indifference "acted outside their authority and therefore that [sovereign] immunity does not apply").

The illegal-acts exception applies here. Ms. Heilman alleges that the remaining Defendants "acted in violation of statutory or constitutional law." Murphy, 844 F.3d at 660 (cleaned up). Specifically, Ms. Heilman contends that these Defendants violated the Eighth Amendment's mandate against cruel and unusual punishment. These allegations, if true, would place these Defendants' acts and omissions outside the protected scope of their authority. Id. at 661–62 (Manion, J., concurring). "Sovereign immunity," therefore, "does not bar [Ms. Heilman's] state-law claims." Id. And because these Defendants are not immune from willful-and-wanton liability, they cannot receive summary judgment on that ground.

Nor can the remaining Defendants obtain summary judgment on the merits, for the Court's decision on Count I, Ms. Heilman's "federal deliberate indifference claim," is "dispositive." Williams v. Rodriguez, 509 F.3d 392, 404–05 (7th Cir. 2007). To repeat, willful and wanton conduct is that "which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter

indifference to or conscious disregard for the safety of others or their property." <u>Chapman</u>, 241 F.3d at 847 (citing 745 ILCS 10/1–210).  This standard is "remarkably similar" to the standard applied to claims of Eighth Amendment deliberate indifference. <u>Id.</u>  As a result, Defendants' liability for willful and wanton conduct rises and falls with their liability for deliberate indifference.  <u>See id.</u>; <u>Williams</u>, 509 F.3d at 405 (concluding, in deliberate-indifference action, that liability for willful and wanton conduct is derivative of federal liability); <u>cf.</u> <u>Johnson v. Myers</u>, 109 F. App'x 792, 798–99 (7th Cir. 2004) ("Without adequate evidence of deliberate indifference by the jailers, Johnson's state willful-and-wanton claim necessarily fails as well[.]").  Because these Defendants are not entitled to summary judgment on Count I, their motion for summary judgment on Count III is denied as well.

## V. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment, see d/e 103, is GRANTED IN PART and DENIED IN PART.  Plaintiff's remaining claims will proceed to trial.

**IT IS FURTHER ORDERED THAT:**

1.  The Clerk is DIRECTED to terminate as parties Defendants Rachelle Aiken, Greg DeJarnette, Jacob Gerringer, and Chase Goleash.

**IT IS SO ORDERED.**

**ENTERED:  JUNE 12, 2023**

**FOR THE COURT:**

*s/ Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**